William A. WATERS and Donald Samuels, Plaintiffs-Appellants,

v.

WISCONSIN STEEL WORKS OF INTERNATIONAL HARVESTER COMPANY, a corporation, and United Order of American Bricklayers and Stone Masons, Local 21, an unincorporated association, Defendants-Appellees.

UNITED ORDER OF AMERICAN BRICKLAYERS AND STONE MASONS, LOCAL 21, Defendant-Appellant,

v.

William A. WATERS and Donald Samuels, Plaintiffs-Appellees.

INTERNATIONAL HARVESTER COMPANY, Defendant-Appellant,

v.

William A. WATERS and Donald Samuels, Plaintiffs-Appellees.

Nos. 73-1822 to 73-1824.

United States Court of Appeals, Seventh Circuit.

Argued April 22, 1974.

Decided Aug. 26, 1974.

Rehearing and Rehearing En Banc Denied Nov. 26, 1974.

■■■■■■■■■■■■■■■

———————◆———————

Judson H. Miner, Chicago, Ill., for William A. Waters and Donald Samuels.

Charles L. Thomas, E. E. O. C., Washington, D. C., for amicus curiae.

Marvin Gittler, Thomas M. Thomas, Thomas A. Gottschalk, Chicago, Ill., for Wisc. Steel Works and International Harvester Co.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and SPRECHER, Circuit Judge.

SWYGERT, Chief Judge.

Plaintiffs William A. Waters and Donald Samuels, both black journeymen bricklayers, appeal from a judgment of the district court entered after a bench trial finding that the defendants had violated both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and section I of the Civil Rights Act of 1866, 42 U.S.C. § 1981. The plaintiffs' appeals center solely on the district court's approach to calculating the plaintiffs' back-pay award and attorneys' fees under Title VII. Defendants International Harvester Company (International), Wisconsin Steel Works of International Harvester Company (Wisconsin Steel), and Local 21, United Order of American Bricklayers and Stone Masons (Local 21), cross-appeal from the district court's finding that they violated § 1981 and Title VII.

International operates a large steel plant in Chicago, known as the Wisconsin Steel Works. It employs a small force of bricklayers to·maintain and repair blast furnaces. Local 21 is the exclusive bargaining representative for the bricklayers employed by International.

Waters and Samuels initiated an action in the district court on December 27, 1968, claiming that certain employment practices and policies of International and joined in by Local 21 deprived them of rights secured by: Section I of the Civil Rights Act of 1866, 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Labor Management Relations Act, 29 U.S.C. § 185(a); and the National Labor Relations Act, 29 U.S.C. § 151 et seq. Before filing their suit, plaintiffs in May, 1966 had registered complaints with both the Illinois Fair Employment Practices Commission and the United States Equal Employment Opportunity Commission (EEOC) charging Wisconsin Steel with racial discrimination due to Wisconsin Steel's lay-off of Waters and its subsequent refusal to rehire him and its failure to hire Samuels. The State Commission dismissed the charges as unsubstantiated; likewise the EEOC concluded in a February, 1967 decision that no probable cause existed to believe that Wisconsin Steel had violated Title VII. But as a result of new evidence that white bricklayers had been hired after Waters sought reinstatement and Samuels had requested initial employment, the EEOC reassumed jurisdiction and, on reconsideration, it determined that the plaintiffs had cause to sue.

Shortly thereafter the plaintiffs initiated their action as a class action against both International and Local 21. On defendants' motions, the district court dismissed plaintiffs' claims. On appeal we reversed and remanded the cause for a trial. Waters v. Wisconsin Steel Works, 427 F.2d 476 (7th Cir. 1970), cert. denied, 400 U.S. 911, 91 S. Ct. 137, 27 L.Ed.2d 151 (1970). On remand the plaintiffs abandoned their class allegations and proceeded to trial on claims of individual discrimination against the two plaintiffs.

At trial Waters challenged the existence of Wisconsin Steel's "last hired, first fired" seniority system for bricklayers. Waters claimed the system violated section 1981 and Title VII in that it perpetuated alleged prior discriminatory policies and hiring practices of the defendants. In addition, both plaintiffs condemned as violative of Section 1981 and Title VII two amendatory agree-

ments to the collective bargaining contract entered between Wisconsin Steel and Local 21 which affected employee recall rights and seniority status.

With respect to the seniority system as it relates to Waters, it was established at trial that the collective bargaining agreements between Wisconsin Steel and Local 21 have since 1946 provided for a "last hired, first fired" seniority system for bricklayers employed at Wisconsin Steel. The seniority system gives full credit to all bricklayers for their actual length of service or earned seniority as bricklayers. Seniority vests after a 90-day probationary period and may be broken by various events, including lay-offs in excess of two years. The system governs the order of lay-offs and recalls of bricklayers.

Waters first inquired about employment at Wisconsin Steel in the fall of 1957. He was told that no bricklayers were being hired. Approximately seven years later Waters inquired a second time for employment and was hired in July 1964. Two months later, in September 1964, Waters was laid off according to his length of service and before completing his 90-day probationary period and achieving contractual seniority status. Waters' lay-off was one of several lay-offs during late 1964 and 1965 which occurred as a result of an anticipated decrease in the steel plant's bricklaying needs because of a fundamental change in the steelmaking process. (During this period, Wisconsin Steel was converting from twelve open-hearth brick-lined furnaces to two basic oxygen furnaces, and, consequently, it had been anticipated that the volume of brick maintenance work would be correspondingly reduced.) By March 1965, over thirty bricklayers with up to ten years seniority had been laid off. Wisconsin Steel had expected that over half of the laid-off bricklayers, including eight bricklayers with five to six years seniority, would not be recalled within the two-year period and that pursuant to the terms of the collective bargaining contract these bricklayers' contractual seniority rights would be lost.

During the course of the next year, however, Wisconsin Steel became aware that it had underestimated its bricklayer requirements for the basic oxygen steel-making process. The company therefore began recalling bricklayers in the order of their length of prior service.

Besides the contractual right of recall for those employees with contractual rights, Wisconsin Steel had a policy that former employees, including bricklayers who did not have contractual seniority rights would nonetheless be recalled according to their length of service. In March 1967, pursuant to this policy and not because of contractual right of recall, Waters was recalled. Waters accepted reinstatement and continued to work until May 19, 1967 when he was once again laid off because of a temporary reduction in plant operations. Waters was recalled on August 30, 1967, but refused this third offer of employment because he had another job and also, because he believed that his return to Wisconsin Steel might prejudice his then pending EEOC charges against Wisconsin Steel which he had filed in May 1966.

With respect to the amendatory agreements to the collective bargaining contract which plaintiffs challenge as discriminatory, the following evidence was adduced at trial. Prior to 1965, Wisconsin Steel, unlike other steel plants, had no provision for severance pay in its collective bargaining agreement with Local 21. However, in March 1965, after the decision had been made to lay off eight white bricklayers having five to six years seniority, the company negotiated a "severance agreement" with Local 21, dealing exclusively with these eight employees. The agreement provided that after being laid off the eight bricklayers could elect to retain their contractual seniority rights or receive $966.00 in severance pay. An election to retain contractual seniority rights carried with it the risk that these bricklayers would

lose their seniority rights anyway after two years on lay-off; this risk was believed to be substantial in view of Wisconsin Steel's anticipated decline in bricklaying needs. Consequently, the eight bricklayers, subsequent to their involuntary lay-off pursuant to seniority, elected to receive severance pay, thereby forfeiting their contractual seniority rights to recall.

As noted earlier, it became apparent to Wisconsin Steel in 1966 that it had underestimated its predicted bricklaying requirement for the basic oxygen process. In view of its new felt demand for bricklayers and its asserted belief that an injustice had been done to the eight bricklayers who had exchanged their contractual seniority rights for $966.00, the company proposed to Local 21 that the March 1965 severance pay agreement be partially nullified by an amendment restoring the eight bricklayers' contractual seniority rights for purposes of recall. Accordingly, an amendatory agreement was entered into in June 1966. Three of the eight white bricklayers who had previously accepted the severance pay also accepted the recall and returned to work, two in July 1966 and the third in January 1967. In each instance the man was rehired without reapplying with the company for employment.

At trial plaintiffs contended that the June 1966 amendatory agreement was, in effect, discriminatory for it restored contractual seniority status to the three white bricklayers who accepted recall and thereby advanced those three bricklayers ahead of Waters and Samuels on the hiring and recall roster. The defendants countered plaintiffs' contention by arguing that the three bricklayers would have been entitled to prior recall in any event pursuant to the company policy whereby former employees without contractual rights of recall are nevertheless recalled pursuant to their length of prior service.

After submission of the evidence the trial judge made certain findings of fact. He also made the following conclusions of law:

"4. Prior to April, 1964, Wisconsin Steel discriminated in the hiring of bricklayers in violation of 42 U.S.C. § 1981.

5. The seniority system negotiated between defendants Wisconsin Steel and Local 21 had its genesis in a period of racial discrimination and is thus violative of 42 U.S.C. § 1981 and is not a bona fide seniority system under Title VII.

6. By laying off plaintiff Waters in September, 1964, pursuant to the terms of the seniority system of the collective bargaining agreement, defendants violated both § 1981 and Title VII. Defendants also violated § 1981 and Title VII when, in reliance on the seniority system, Wisconsin Steel failed to recall plaintiff Waters in March, 1965, and when it again laid off plaintiff Waters in May, 1967.

7. Defendants June 15, 1966 agreement to amend the earlier severance pay agreement and thereby restore recall rights to an all white group of bricklayers who otherwise possessed no recall rights under the prior severance pay agreement, thereby placing those white bricklayers ahead of black bricklayers, constituted a violation of both § 1981 and Title VII. This violation discriminated against the rights of both plaintiff Waters and plaintiff Samuels."

Pursuant to its decision the district court directed Wisconsin Steel to offer employment to Waters and Samuels and ordered both defendants to share in a back-pay award of $5000 to Waters and $5000 to Samuels. In addition, the court awarded the sum of $5000 as attorneys' fee for plaintiffs' counsel and as a joint liability of the defendants.

We address the following issues in these appeals: (1) Whether the district court properly asserted jurisdiction over either defendant under 42 U.S.C. § 1981; (2) where an aggrieved plaintiff must exhaust grievance procedures un-

der a collective bargaining agreement before he can initiate a lawsuit under section 1981; (3) whether the trial court's conclusion that defendant Wisconsin Steel discriminated in the hiring of bricklayers prior to April 1964 is clearly erroneous; (4) whether the trial court erred in concluding that Wisconsin Steel's "last hired, first fired" seniority system is violative of 42 U.S.C. § 1981 and is not a bona fide seniority system under Title VII; (5) whether there was error in holding that defendants' June 15, 1966 agreement to amend the prior severance pay agreement thereby restoring contractual recall rights to an all-white group of bricklayers constituted a violation of section 1981 and Title VII; (6) whether the participation of defendant Local 21 as signatory to the collective bargaining agreement as well as to the two challenged agreements to amend the collective bargaining agreement is sufficient to hold the union liable under section 1981; (7) whether the district court erred in its calculation of the back-pay award; and (8) whether the district court erred in its making the award of attorneys' fees to counsel for the plaintiffs. We affirm in part the district court's finding on liability, but reverse and remand with respect to the questions of back-pay damages and attorney fees.

## I

Local 21 opposes the district court's assumption of jurisdiction over it on two grounds: The union contends that the plaintiffs did not justify their failure to file charges against Local 21 with the EEOC under Title VII. In addition, it challenges the standing of Waters to sue the union under section 1981 on the basis that he was not at any relevant time a member of the union.

■ With respect to the argument of Local 21 that the plaintiffs have failed to prove a reasonable excuse for bypassing the administrative procedures of Title VII, we previously addressed that issue in Waters v. Wisconsin Steel, 427 F.2d 476 (7th Cir. 1970) where we stated:

"We hold, therefore, that an aggrieved person may sue directly under section 1981 if he pleads a reasonable excuse for his failure to exhaust EEOC remedies. We need not define the full scope of this exception here. Nevertheless, we believe that plaintiffs in the case at bar have presented allegations sufficient to justify their failure to charge Local 21 before the Commission.

We rely particularly on the following allegations. The primary charge of racial discrimination made by plaintiffs is based on an amendment of the collective bargaining agreement between Harvester and Local 21. That amendment occurred in June 1966 after plaintiffs filed their charge before the EEOC. Until this amendment plaintiffs were, at least arguably, unaware of the participation of Local 21 in Harvester's alleged policy of racial discrimination." 427 F.2d at 487.

The evidence adduced at trial supports plaintiffs' allegation that the collective bargaining agreement amendment occurred after the EEOC charge was filed thereby justifying the by-pass of the EEOC. Moreover, we note and are somewhat inclined to agree with the recent decisions which hold that exhaustion of Title VII remedies, or reasonable excuse for failing to do so, is not a jurisdictional prerequisite to an action under section 1981. See, e. g., Long v. Ford Motor Co., 496 F.2d 500 (6th Cir. 1974).

■ As to the contention that Waters lacks standing to sue under section 1981, Local 21 premises its argument on the assertion that jurisdiction under section 1981 is dependent on a contractual relationship between Waters and the union (which did not exist here for Waters was not a member of the union). Section 1981 assures that "all persons with-

in the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." The subject matter of this suit is cognizable under section 1981 for Waters complains that his right to enter into an employment contract with the company on the same basis as whites was impaired by the joint action of the union and company. It follows that his nonmembership in the union has no bearing on his section 1981 claim against Local 21.[1]

## II

Local 21 contends that plaintiffs should be barred from proceeding against the union under section 1981 because they failed to exhaust their contractual remedies under the collective bargaining agreement. The nature of plaintiffs' claims however is that of a complaint against racial discrimination in employment and not a labor law action, asserting rights under a collective bargaining contract. Indeed, the focus of this civil rights suit is an attack by plaintiffs on the contract itself as embodying racially discriminatory practices.

Title VII and section 1981 are "parallel or overlapping remedies against discrimination." Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Consequently, in fashioning a substantive body of law under section 1981 the courts should, in an effort to avoid undesirable substantive law conflicts, look to the principles of law created under Title VII for direction. It is well-established that under Title VII there is no exhaustion of contractual remedies requirement. Alexander v. Gardner-Denver Co., *supra*, 415 U.S. 36, 94 S.Ct. 1011; Rios v. Reynolds Metal Co., 467 F.2d 54, 57 (5th Cir. 1972); Bowe v. Colgate-Palmolive Co.,

416 F.2d 711 (7th Cir. 1969). Moreover, an exhaustion of remedies requirement does not appear to apply to claims for relief brought under any of the civil rights acts. *See* Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1960); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); D'Amico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); and King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).[2] We are of the view, therefore, that plaintiffs could properly proceed against the union under section 1981 without first exhausting any contractual remedies under the collective bargaining agreement.

## III

Wisconsin Steel contends that the evidence does not support the district court's holding that "[p]rior to April, 1964, Wisconsin Steel discriminated in the hiring of bricklayers in violation of 42 U.S.C. § 1981." We believe the record supports the conclusion that Wisconsin Steel engaged in racially discriminatory hiring policies with respect to the position of bricklayer prior to the enactment of Title VII.

Wisconsin Steel did not hire its first black bricklayer until April 1964 although blacks had made inquiries seeking employment as early as 1947. In addition, the evidence reflects a discriminatory departmental transfer policy whereby blacks hired by Wisconsin Steel as laborers were denied the opportunity available to white laborers to transfer to the bricklayers' apprenticeship program.

It is urged by the company that the "single statistic" of no black bricklayers prior to 1964 is not sufficient to make a showing of discrimination. Although we doubt the validity of this contention (*see* Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 247 (10th Cir. 1970);

---

1. In addition, jurisdiction over Wisconsin Steel was properly entertained under both Title VII and section 1981.

2. Although these cases treated the exhaustion of remedy requirement with respect to 42 U.S.C. § 1983 of the Civil Rights Act, we think the Court's analysis is applicable to actions brought under 42 U.S.C. § 1981.

Parham v. Southwestern Bell Tel. Co., 433 F.2d 421, 426 (8th Cir. 1970)), we think that the statistical data joined by the evidence indicating repeated attempts by blacks ·to obtain employment as bricklayers substantiates the trial court's finding of discrimination.

Wisconsin Steel further contends that plaintiffs did not make a showing of past racial discrimination because they failed to prove that black applicants were denied actual job openings. Relying on McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the defendant in effect urges that discrimination can only be shown if there is a precise matching of job openings and job applicants. While a showing of matching might be required where the focus of inquiry is on an "individualized hiring decision," such as in McDonnell Douglas,[3] we do not believe such a showing is required, where, as here, the inquiry centers on whether the employer engaged in discriminatory hiring procedures or practices in the past unrelated to the subsequent employment applications. Accordingly, we do not find McDonnell Douglas controlling on this issue.

## IV

With respect to the validity of Wisconsin Steel's employment seniority system which embodies the "last hired, first fired" principle of seniority for job recalls and layoffs, the district court held:

"5. The seniority system negotiated between defendants Wisconsin Steel and Local 21 had its genesis in a period of racial discrimination and is thus violative of 42 U.S.C. § 1981 and is not a bona fide seniority system under Title VII.

6. By laying off plaintiff Waters in September, 1964, pursuant to the terms of the seniority system of the collective bargaining agreement, defendants violated both § 1981 and Title VII. Defendants also violated § 1981 and Title VII when, in reliance on the seniority system, Wisconsin Steel failed to recall plaintiff Waters in March, 1965, and when it again laid off plaintiff Waters in May, 1967."

The plaintiffs contend that Wisconsin Steel's employment seniority system perpetuates the effects of past discrimination in view of the facts that blacks will be laid off before and recalled after certain whites who might not otherwise have had seniority had Wisconsin Steel not discriminated in hiring prior to 1964. They argue that such a system facilitates a return to the status quo of the era when Wisconsin Steel hired no black bricklayers. Wisconsin Steel argues, however, that an employment seniority system which accords workers credit for the full period of their employment is racially neutral and as such is a bona fide seniority system within the contemplation of § 703(h) of Title VII, 42 U.S.C. § 2000e–2(h). The defendant says that to strike down its employment seniority system would be to countenance reverse discrimination.

It is asserted that here there is an employment seniority system (unlike the departmental or job seniority systems which courts have modified under Title VII) which grants workers equal credit

---

3. In McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Court stated that a plaintiff in a Title VII case establishes a prima facie case of discrimination by showing:

"(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's. qualifications." 411 U.S. at 802, 93 S.Ct. at 1824.

In referring to the foregoing elements, the Court stated in a footnote:

"The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802, fn. 13, 93 S.Ct. at 1824.

for actual length of service with the employer. Under a departmental seniority system, seniority is measured by length of service in a department while a job seniority system accords seniority on the basis of length of service on a job. The decisions modifying these two forms of seniority systems have routinely involved situations where the employer previously maintained segregated work forces, prohibiting transfers by blacks into various jobs or departments which offered improved employment conditions. With the advent of Title VII the employer would facially lift the restrictions on transfers but would effectively prohibit transfers through a department or job seniority policy whereby blacks would be given no credit for their previous years of employment with the employer and would be placed at the bottom of the employee roster in the formerly all-white job or department to which they transferred. Often in modifying these discriminatory forms of seniority systems the courts have deployed an employment seniority system as a racially neutral and adequate remedy to the discriminatory impact of the prior seniority systems.

We are of the view that Wisconsin Steel's employment seniority system embodying the "last hired, first fired" principle of seniority is not of itself racially discriminatory or does it have the effect of perpetuating prior racial discrimination in violation of the strictures of Title VII. To that end we find the legislative history of Title VII supportive of the claim that an employment seniority system is a "bona fide" seniority system under the Act. The history points out that:

"Title VII would have no effect on established seniority rights. Its effect is prospective and not retrospective. Thus, for example, if a business has been discriminating in the past and as a result has an all-white working force, when the title comes into effect the employer's obligation would be simply to fill future vacancies on a nondiscriminatory basis. He would not be obliged—or indeed, permitted—to fire whites in order to hire Negroes, or to prefer Negroes for future vacancies, or, once Negroes are hired, to give them *special seniority rights at the expense of the white workers hired earlier.* (However, where waiting lists for employment or training are, prior to the effective date of the title, maintained on a discriminatory basis, the use of such lists after the title takes effect may be held an unlawful subterfuge to accomplish discrimination.)" Interpretative Memorandum of Senators Clark and Case, 110 Cong.Rec. 7213 (April 8, 1964). (Emphasis added).

In response to written questions by Senator Dirksen, one of the Senate floor managers for the bill, Senator Clark, emphasized that the "last hired, first fired" principle of seniority would be preserved under Title VII:

"Question. Would the same situation prevail in respect to promotions, when that management function is governed by a labor contract calling for promotions on the basis of seniority? What of dismissals? Normally, labor contracts call for 'last hired, first fired.' If the last hired are Negroes, is the employer discriminating if his contract requires that they be first fired and the remaining employees are white?"

"Answer. Seniority rights are in no way affected by the bill. If under a 'last hired, first fired' agreement a Negro happens to be the 'last hired,' he can still be 'first fired' as long as it is done because of his status as 'last hired' and not because of his race." 110 Cong.Rec. 7217 (April 8, 1964).

Moreover, to alleviate any further doubt as to the meaning of Title VII, Senator Clark obtained an interpretative memorandum from the Department of Justice which indicated that "last hired, first fired" seniority rules would be valid under Title VII:

"Title VII would have no effect on seniority rights existing at the time it

takes effect. If, for example, a collective bargaining contract provides that in the event of layoffs, those who were hired last must be laid off first, such a provision would not be affected in the least by title VII. This would be true even in the case where owing to discrimination prior to the effective date of the title, white workers had more seniority than Negroes. Title VII is directed at discrimination based on race, color, religion, sex or national origin. It is perfectly clear that when a worker is laid off or denied a chance for promotion because under established seniority rules he is low man on the totem pole he is not being discriminated against because of his race." 110 Cong.Rec. 7207 (April 8, 1964).

In Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968), the district court was faced with a proposal by the plaintiffs, akin to that presented here, in derogation of the employment seniority of white workers. There, after a thorough analysis of the legislative history of Title VII, Judge Butzner wrote:

> "[T]he plaintiffs' proposal, while not ousting white employees from present jobs, would prefer Negroes even though they might have less employment seniority than whites. Nothing in the act indicates this result was intended." 279 F.Supp. at 519.

Similarly, the Fifth Circuit in passing upon the legislative history of Title VII stated:

> "No doubt, Congress, to prevent 're-verse discrimination' meant to protect certain seniority rights that could not have existed but for previous racial discrimination. For example a Negro who had been rejected by an employer on racial grounds before passage of the Act could not, after being hired, claim to outrank whites who had been hired before him but after his original rejection, even though the Negro might have had senior status but for the past discrimination. As the court

pointed out in *Quarles*, the treatment of 'job' or 'department seniority' raises problems different from those discussed in the Senate debates: 'a department seniority system that has its genesis in racial discrimination is not a bona fide seniority system.'" 279 F. Supp. at 517.

> "It is one thing for legislation to require the creation of *fictional* seniority for newly hired Negroes, and quite another thing for it to require that time *actually worked* in Negro jobs be given equal status with time worked in white jobs. To begin with, requiring employers to correct their pre-Act discrimination by creating fictional seniority for new Negro employees would not necessarily aid the actual victims of the previous discrimination. There would be no guaranty that the new employees had actually suffered exclusion at the hands of the employer in the past, or, if they had, there would be no way of knowing whether, after being hired, they would have continued to work for the same employer. In other words, *creating fictional employment time for newly-hired Negroes would comprise preferential rather than remedial treatment*. The clear thrust of the Senate debate is directed against such preferential treatment on the basis of race.

> .    .    .    .    .    .    .

> "We conclude, in agreement with *Quarles*, that Congress exempted from the anti-discrimination requirements only those seniority rights that gave white workers preference over junior Negroes." Local 189, United Paper-mak & Paperwork v. United States, 416 F.2d 980, 994–995 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). [Emphasis in original and added].

Title VII mandates that workers of every race be treated equally according to their earned seniority. It does not require as the Fifth Circuit said, that a worker be granted fictional seniority or special privileges because of his race.

Moreover, an employment seniority system is properly distinguished from job or department seniority systems for purposes of Title VII. Under the latter, continuing restrictions on transfer and promotion create unearned or artificial expectations of preference in favor of white workers when compared with black incumbents having an equal or greater length of service. Under the employment seniority system there is equal recognition of employment seniority which preserves only the earned expectations of long-service employees.

Title VII speaks only to the future. Its backward gaze is found only on a present practice which may perpetuate past discrimination. An employment seniority system embodying the "last hired, first fired" principle does not of itself perpetuate past discrimination. To hold otherwise would be tantamount to shackling white employees with a burden of a past discrimination created not by them but by their employer. Title VII was not designed to nurture such reverse discriminatory preferences. Griggs v. Duke Power Co., 401 U.S. 424, 430–431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

We are not, however, insensitive to the plaintiffs' argument, and think employers should be discrete in devising an employment seniority system. We recognize that it is a fine line we draw between plaintiffs' claim of discrimination and defendants' countercharge of reverse discrimination. On balance, we think Wisconsin Steel's seniority system is racially neutral and does not perpetuate the discrimination of the past.[4]

### V

We come finally to the pivotal issue in determining liability: whether the June 15, 1966 agreement between Local 21 and Wisconsin Steel to amend an earlier severance pay agreement and thereby recall three white bricklayers who had accepted severance pay under the initial agreement discriminated against the plaintiffs in violation of Title VII and section 1981. In light of Wisconsin Steel's past history of racially discriminatory hiring practices and the racially neutral yet potentially discriminatory impact of the employment seniority system utilized by the company, we hold that the June 1966 agreement reinstating contract recall rights to three white bricklayers was racially discriminatory with respect to Waters, but not discriminatory with respect to Samuels.

The defendants contend that the restoration of contractual seniority rights to the white bricklayers who had previously accepted severance pay did not discriminate against the plaintiffs for it is claimed that the white bricklayers would have been entitled to prior recall in any event in accordance with company policy. As we noted earlier, that policy, pursuant to which plaintiff Waters was himself recalled, provided that former employees without contractual rights of recall would nonetheless be recalled in order of their length of prior service. We do not doubt that a policy favoring recall of a former employee with experience even though white before considering a new black applicant without experience comports with the requirements of Title VII and section 1981. To that end, we do not perceive any discriminatory impact with respect to Samuels who was a new applicant.

With respect to Waters, however, the company policy occupies a different posture. At the outset we note that it is not entirely clear what the company policy was with respect to the priority status of the white bricklayers who had accepted severance pay vis-à-vis employees such as Waters who possessed no contractual seniority. Even assuming that the priority of the white bricklayers accepting severance pay emanated from a long-standing company policy and not from an *ad hoc* determina-

---

4. Having passed scrutiny under the substantive requirements of Title VII, the employ-ment seniority system utilized by Wisconsin Steel is not violative of 42 U.S.C. § 1981.

tion, we are inclined to find that aspect of the company policy to be violative of Title VII and section 1981. We reach such a conclusion due to the fact that Wisconsin Steel through its prior discrimination and its implementation of an employment seniority system occupied a racially precarious position—indeed, at the brink of present discrimination. A company policy of according priority to white bricklayers who had accepted the benefits of severance pay would, in our view, project the company into the realm of presently perpetuating the racial discrimination of the past. The company policy is no defense to the defendants' action in entering the June 1966 agreement restoring contractual seniority to three white bricklayers.

We find the June 1966 agreement, therefore, to be discriminatory with respect to Waters. Moreover, it cannot be urged that the agreement was justified by "business necessity." The practice of restoring contractual seniority to white bricklayers who elected to receive severance pay must be justified, if at all, by a showing of "business necessity." Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In that respect an employment practice " 'can be justified only by a showing that it is necessary to the safe and efficient operation of the business.' " Robinson v. Lorillard Corp., 444 F.2d 791, 797 (4th Cir. 1971), quoting, Jones v. Lee Way Motor Freight, 431 F.2d 245, 249 (10th Cir. 1970). Defendants' claim of employee-employer goodwill and alleged concern for fear of potential labor strife does not rise to the level of urgency required for a demonstration of business necessity.

### VI

Local 21 contends that there is insufficient evidence to support a claim against the union under section 1981. It is enough, however, that the union was an integral party to the June 1966 amendment which discriminated against Waters. Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364 (5th Cir. 1974). Local 21 therefore shares jointly in the liability of Wisconsin Steel.

### VII

Both Waters and defendants join in the contention that the district court erred in calculating the back-pay award to which Waters is entitled. We agree that the trial judge abused his discretion in fashioning the back-pay award. The award was the product of an arbitrary calculation entirely devoid of any reasoned approach to the proper measure of damages. Moreover, the district court's consideration of the absence of a racially discriminatory motive on the part of the defendants was improper. The absence of a discriminatory motive is not a proper basis for denying or limiting relief. Robinson v. Lorillard Corp., 444 F.2d 791, 804 (4th Cir. 1971).

It would appear from the record that but for the June 1966 agreement, Waters would have been recalled on January 17, 1967 and that he would not have been laid off on May 19, 1967. Waters was tendered reemployment on September 5, 1967, which he declined to accept. In our judgment the discriminatory impact of defendants' June 1966 agreement ended with the tender made to Waters in September. The relevant period for computing damages therefore ranges from January 17, 1967 to September 5, 1967.

Plaintiff Waters' damages for the relevant period are to be determined by measuring the difference between plaintiff's actual earnings for the period and those which he would have earned absent the discrimination of defendants. In determining the amount of Waters' likely earnings but for the discrimination, we reject the notion advanced by Waters that since he could have held two jobs while employed at Wisconsin Steel, defendants are therefore liable not only for his lost earnings with Wisconsin Steel but also for his probable lost earnings from a second job. Recompense for economic loss re-

sulting from racially discriminatory practices does not require that we entertain claims of such a speculative and remote nature.

Accordingly, we remand to the district court for findings with regard to Waters' actual and probable earnings for the relevant period.[5]

## VIII

▮▮▮▮▮▮ All parties condemn the district court's method of computing the award of attorney fees to the plaintiffs' counsel pursuant to section 706k of Title VII, 42 U.S.C. § 2000e-5k. Although the determination of reasonable attorney fees is left to the sound discretion of the trial judge, Weeks v. Southern Bell Tele. & Tele. Co., 467 F.2d 95, 97 (5th Cir. 1972), we are convinced that the method whereby the judge computed the award of attorney's fee was so lacking of analysis that it constituted an abuse of discretion.

In fashioning a method of analysis to assist in determining the amount of attorney fees properly to be awarded in a Title VII action, we cannot subscribe to the view that attorney fees are to be determined solely on the basis of a formula applying "hours spent times billing rate." We recognize however that such a factor is a consideration in making the ultimate award and indeed it is a convenient starting point from which adjustments can be made for various other elements. Other elements to be considered are set out in the Code of Professional Responsibility as adopted by the American Bar Association:

> Factors to be considered as guides in determining the rasonableness of a fee include the following:
>
> (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill req-

uisite to perform the legal service properly.

> (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
>
> (3) The fee customarily charged in the locality for similar legal services.
>
> (4) The amount involved and the results obtained.
>
> (5) The time limitations imposed by the client or by the circumstances.
>
> (6) The nature and length of the professional relationship with the client.
>
> (7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
>
> (8) Whether the fee is fixed or contingent.

Disciplinary Rule 2–106.

The Code of Professional Responsibility clearly reflects that an award of attorney fees involves the coalescence of many considerations including the reasonbleness of the time spent by counsel, the extent of counsel's success, and the complexity of the case. An analysis by the district court which encompasses the foregoing considerations is most assuredly an analysis well within the bounds of trial court discretion. Accordingly, we remand to the district court for reconsideration of attorneys' fees in light of the aforementioned factors.

The judgment of liability is affirmed in part as to plaintiff Waters and reversed as to plaintiff Samuels. In accordance with Circuit Rule 23 we remand for further consideration on the question of damages and award of attorney fees to plaintiff Waters, consistent with the views expressed herein.

---

5. It would appear that Wisconsin Steel concedes in its brief that Waters would not have been laid off on May 19, 1967 had he been recalled on January 17, 1967. (Defendant's Brief, p. 44.) The record is not clear on this matter. Therefore we direct that there be findings thereon if defendant does not concede the point. It should be noted however that the outermost parameters of defendants' liability extend from January 17, 1967 to September 5, 1967.