Thomas J. STRAMA, Plaintiff,

v.

Paul Q. PETERSON, M.D., et al., Defendants.

No. 78 C 2144.

United States District Court, N.D. Illinois, E.D.

April 8, 1983.

See also, D.C., 537 F.Supp. 668; 7th Cir., 689 F.2d 661.

Stephen Seliger, Chicago, Ill., for plaintiff.

Moshe Jacobius, Asst. Atty. Gen., Chicago, Ill., for state defendants.

MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Thomas Strama ("Strama") was successful against each of the defendants in this 42

U.S.C. § 1983 ("Section 1983") case brought to challenge Strama's decertification and firing as a paramedic with the City of Chicago Fire Department. Before trial the successor to now-deceased Chicago Fire Commissioner Richard Albrecht ("Albrecht") settled by reinstating Strama with full back pay, fringe benefits and seniority. Then after a two-week jury trial:

1. Dr. Frank Baker ("Dr. Baker") of the University of Chicago, head of the City's paramedic program, was found liable for $53,000 ($13,000 in compensatory and $40,000 in punitive damages) on Strama's pendent state law claims (not under Section 1983) and

2. Dr. Paul Peterson and Karen Swanson (collectively "State Defendants") were found liable for an aggregate of $7,000 in compensatory damages under Section 1983.

Successful Section 1983 actions also carry with them the right to fee awards under 42 U.S.C. § 1988 ("Section 1988"). Before trial this Court awarded Strama $45,551.56 against Albrecht, 541 F.Supp. 75 (N.D.Ill. 1982) ("Strama I"), only to have that amount reduced to $32,017.81 by our Court of Appeals, 689 F.2d 661 (7th Cir.1982) ("Strama II," of which more later). Strama now seeks a post-trial award against State Defendants.[1] This opinion deals with the several problems that presents.

### Standards for the Fee Award

Our Court of Appeals has often repeated and often applied the standards for attorney's fee awards as articulated in *Waters v. Wisconsin Steel Works of International Harvester Co.,* 502 F.2d 1309, 1322 (7th Cir. 1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). This Court sought to apply those standards in *Strama I.* If it erred in communicating just how

those factors operated in this case, thus contributing to the reduction by the Court of Appeals, certainly Strama and Seliger should not be penalized for that fact. Accordingly this opinion will (at the risk of courting a repeat performance) address the issue again.

State Defendants' attack on the reasonableness of the *time* spent by Strama's counsel is dealt with later in this opinion and found wholly unwarranted. Development of a "lodestar" figure therefore depends primarily on the appropriate hourly rate.

This Court did *not* (as *Strama II* appeared to assume) apply an overall multiplier to the lodestar amount in *Strama I.* Instead it focused on the established value for like services in the Chicago legal community.[2] It drew on its own then-fresh experience in the practice as the senior active partner (and the principal billing partner) in a Chicago firm, familiar with the "going rate" for lawyers of the skill and seniority of Strama's principal counsel Stephen Seliger ("Seliger"). And it found that going rate—the fair market value of Seliger's services—to be $125 per hour. For better or worse, this Court views the Court of Appeals' approach in *Strama II* as having missed an important aspect of Section 1988 law this Court thought implicit in its own analysis—but that this Court obviously should have made explicit, so the Court of Appeals could have dealt with the question directly.

In other contexts courts (including our Court of Appeals) have consistently made plain that the proper Section 1988 test is not what the plaintiff's lawyer has charged *in fact,* but rather what the reasonable value of the lawyer's services is. That may arguably be a contradiction in free market terms, but it is one the courts have accepted. Losing civil rights defendants have not

---

1. After the jury verdict Strama settled with Dr. Baker, apparently for a lump sum amount. This opinion deals later with the effect of the different jury awards on different grounds against different defendants.

2. *Strama I* (541 F.Supp. at 77) rather *compared* the result it reached, based on the reasonable

market value of Seliger's services, with what a multiplier of Seliger's actual billing rate in other cases ($80 per hour) would have produced. But it actually found that a $125 per hour *lodestar* rate was appropriate under the circumstances.

been successful in challenging awards to lawyers acting pro bono, or salaried lawyers, on the ground plaintiffs would not in fact have had to pay the amount of fees actually awarded. See, e.g., *Gautreaux v. Chicago Housing Authority,* 690 F.2d 601, 612–13 (7th Cir.1982), *petition for cert. filed,* 51 U.S.L.W. 3583 (U.S. Jan. 31, 1983) (No. 82–1289). Were the rule otherwise, the civil rights violator would stand to obtain a windfall from the fact the plaintiff had to resort to a Legal Assistance Foundation lawyer or an ACLU volunteer lawyer. In another variant of the same concept, our Court of Appeals has recently rejected both the "bright prospects" standard and the notion that a contingent fee contract should serve "as an automatic ceiling on the amount of a [Section 1983 case] award." *Sanchez v. Schwartz,* 688 F.2d 503, 505 (7th Cir.1982), followed in *Lenard v. Argento,* 699 F.2d 874, 900 (7th Cir.1983).[3]

No principled distinction seems reasonable between pro bono or salaried lawyers (or for that matter, lawyers for large firms) on the one hand and a lawyer like Seliger on the other, simply because the latter has opted for life as a sole practitioner rather than for pro bono work or for the large firm practice to which his high-quality credentials would give him entree.[4] Under the facts of life in the law practice, Seliger performs the bulk of his work in cases that depend on fee awards, and in the comparatively few situations where he *can* charge on an hourly basis his clients cannot bear the higher tariff his counterparts in larger firms command from deeper-pocket clients.

▮▮▮ Because the issue has been confronted by our Court of Appeals only inferentially, and because the matter is one of such wide-ranging applicability, this Court will risk laboring the subject to avoid any further misunderstanding of its views and holding. In sum the operative principles line up this way:

1. We seek under Section 1988 for "a reasonable attorney's fee."

2. What is "reasonable" is *not* limited by what the individual lawyer involved has contracted to charge in the case in which fees are being awarded. *Sanchez; Lenard.*

3. What is "reasonable" is also *not* limited by what the individual lawyer charges in his or her practice generally. *Gautreaux.*

Accordingly one indicium of the "reasonable" fee *may* be the price the lawyer places on his or her services in this or other situations, but the cases have rejected that as the conclusive factor in ascertaining the market rate. Seliger cannot fairly be placed in a limbo unoccupied by the rest of lawyerdom.

If the search is indeed for the reasonable fee—for the fair market value of the lawyer's services—the answer is easy. Affidavits tendered by Seliger and uncontroverted by State Defendants[5] confirm what this Court's own experience had taught the first time around: Seliger is *at least* a $125 per hour lawyer, not an $80 per hour lawyer, in terms of fair value in today's market.[6]

This Court's refusal to apply a multiplier in *Strama I,* 541 F.Supp. at 77 was based on the fact the legal questions posed under Section 1983 were not unusually complex. That proposition was, in this Court's opinion, mistakenly converted by *Strama II,* 689 F.2d at 665, into a conclusion that the full

---

**3.** *Sanchez* (688 F.2d at 505) confirms that what the lawyer may have *contracted* to charge does not control the court's decision as to the value of the services. And if that is so as to the very case in which the lawyer and client have entered into a contract, it should follow a fortiori that what a lawyer (here Seliger) customarily charges in *other* kinds of cases is not controlling under Section 1988.

**4.** See Appendix A for Seliger's resume.

**5.** They challenge Strama's *legal* right to file affidavits at all (on their law-of-the-case theory, dealt with later), but have offered nothing on the *factual* issue of reasonableness.

**6.** As the affidavits in Appendix B demonstrate, Seliger's peers value his non-trial time between $125 and $175 an hour and his trial time between $125 and $200 an hour. If the flaw in *Strama I* was the lack of an evidentiary record (see *Sanchez,* 688 F.2d at 506 n. 9), that absence has been more amply cured.

reasonable value of Seliger's services should not be awarded. In any event, the issue now is materially different, for the current motion involves services rendered by Seliger during the trial (which was not of course involved in the Albrecht pretrial settlement). In terms of the Section 1983 questions alone, and particularly (though not solely) in terms of the handling of the trial itself, this Court finds the litigation drew on Seliger's skills appropriately, and if those skills in fact have a reasonable fair market value of $125 (which this Court specifically finds), that figure (and not a lower one) should be awarded.

Accordingly this Court determines once again—this time supported by an ample evidentiary record and the conduct of the trial, not only by this Court's own prior experience and knowledge in the market— that the reasonable value of the services provided by Seliger is the real-value lodestar figure derived by multiplying the hours spent times a $125 hourly rate. For each of the other lawyers and paralegals the lodestar figure is that requested by Strama (State Defendants have offered no contest in that respect).

### Law of the Case

■ This Court inquired of the parties on its own motion whether law of the case (or perhaps defensive collateral estoppel) should apply to bar a fresh look at the Seliger hourly rate. After consideration, this Court will not do so for three reasons:

1. Much of the time involved in the current petition is trial time (the rest being trial preparation). Though it was not this Court's former law firm's practice to apply a premium to trial time (like wartime combat pay),[7] that factor is taken into account by some firms and some decisions.[8]

2. As already stated, Seliger disclosed a high level of skill in the trial itself. Those activities represented "more difficult legal tasks" than those referred to by *Strama II* in setting an $80 rate.

3. If the Court of Appeals' *Strama II* decision on the hourly rate (without taking into account the different factors already identified) were in fact in part the result of failure of communication of the principles now better articulated in the preceding section of this opinion, it would appear unfair for the consequences to be visited on Strama and Seliger.

### Fee Allowable Against State Defendants

■ Added complexity is injected into the problem by the differing results here as to the three sets of defendants—Albrecht having settled before trial and then having paid a fee award, Baker having been the subject of the large ($53,000) jury award on pendent state law claims and then having paid an unknown lump sum in settlement, and State Defendants having been the subject of the much smaller ($7,000) jury award. Ordinarily tortfeasors are jointly and severally liable, with the plaintiff having the free choice of whom to pursue (subject to possible contribution among the tortfeasors at the behest of the defendant required to pay in the first instance). But the situation here seems to call for different treatment:

1. Where each defendant is liable for a discrete amount of damages (instead of joint and several liability for a single figure), joint and several liability for the entire fee award appears inappropriate. *See Dean v. Gladney*, 621 F.2d 1331, 1340 (5th Cir.1980), *cert. denied*, 450 U.S. 983, 101 S.Ct. 1521, 67 L.Ed.2d 819 (1981).

---

**7.** For the most part the premium notion is a relic of the days—within this Court's memory—when lawyers were much less prone to keep accurate (or sometimes any) time records. Because of the recognition that a full trial day required expenditure of preparation time the same day, both before and after the trial itself, the regular practice was to bill more for a full trial day than for a full day spent in other

lawyering that did not demand such collateral time. Now that lawyers are much more meticulous about recording whatever time is spent, both day and night, the reason for applying a different rate for selling a lawyer's trial time has really vanished.

**8.** *See, e.g., Sanchez*, 688 F.2d at 506, approving an $85 office and a $125 in-court rate.

2. Where the disparity between the liability amounts is as great as here, the added principle that "usually attorneys' fees should not be granted 'greatly in excess of a client's recovery' " (*Strama II*, 689 F.2d at 665) reinforces that conclusion.

■ Some recapitulation of the facts will be useful in applying those principles to a conclusion:

1. Strama's "recovery" from Albrecht via settlement had a value substantially greater than the dollars paid after taking earnings in mitigation and applicable deductions into account.[9] Reinstatement plus the revesting of fringe benefits was a major victory for Strama. In conjunction with his victory against Albrecht, Strama was awarded and paid $32,017.81 as the result of *Strama II*.

2. Strama's total recovery of actual damages from Baker and State Defendants, as awarded by the jury, was $20,000 (65% against Baker and 35% against State Defendants). This is a more relevant comparison than one that takes the jury-awarded punitive damages into account.

3. State Defendants attack the time spent by Strama's counsel as excessive, but their broadside onslaught is totally without ammunition. This Court specifically finds the claimed time to have been reasonable. In the aggregate, after adding back a little more than $5,000 in time charges that Strama's counsel character-izes as allocable solely to Dr. Baker,[10] the total fees and expenses attributable to State Defendants and Dr. Baker come to $40,256.25.[11]

After full consideration this Court has determined that a fees award proportioned to the jury's award of actual damages is reasonable. It reflects in a reasonably proportionate way the fact Strama lost on his Section 1983 claim against Dr. Baker and prevailed against Dr. Baker on state claims that do not carry an attorney's fee award with them. *See Johnson v. Brelje*, 701 F.2d 1201, 1211–1212 (7th Cir.1983). Without question it gives Strama *less* than his due on a strict allocation, but that would entail a great deal of additional work in a necessarily imprecise separation and apportionment of time.[12] However, that lesser result does not seem harsh in view of the Court of Appeals' admonition, repeated in *Strama II*, that "usually attorneys' fees should not be granted 'greatly in excess of a client's recovery.' " And the fact remains that the total recovery against State Defendants was just $7,000.

## Conclusion

There is no really "right" answer to the interacting issues already identified. Whatever the result, it will be reasonable in terms of some of those considerations and arguable as to others. But the result reached here is more than fair as to State Defendants (that is, it burdens them less than a direct separation and allocation

---

**9.** Strama's gross back pay was $65,000. After deduction of post-discharge earnings the figure was $22,095.17 (it would distort matters also to lop off the amounts deducted for Strama's direct benefit as taxes and pension contributions). *Strama II*, 689 F.2d at 662.

**10.** Strama's July 2 supplemental memorandum reflected the deduction (as time attributable solely to Dr. Baker) of 39.5 hours of Seliger's time and 1.75 hours of Kenneth Flaxman's time, each at $125 an hour, and 4.5 hours of David Johnson's time at $50 per hour. Under the approach taken in the text, identifiable time plainly allocable to State Defendants alone is apportioned between them and Dr. Baker as part of the total package. It would be grossly unfair to apply that principle only one-way by deducting the few hours of time referred to in

this footnote from the total to be spread among the trial defendants. In the aggregate the calculations in this opinion lean over backward in State Defendants' favor.

**11.** Strama's July 2, 1982 supplemental memorandum claimed $32,437.50, to which this Court has added the $5,381.25 referred to in n. 10 and another $2,437.50 of Seliger's time identified in Strama's September 13, 1982 Response to Defendants' Closing Memorandum.

**12.** It should be emphasized that Strama has made a reasonable (though not wholly persuasive) case for attributing the bulk of the amounts referred to in n. 11 (omitting of course the $5,381.25 figure) to State Defendants.

would), while at the same time it does not seriously disadvantage Strama, given his burden of proof and the Court of Appeals' concept of avoiding great disparities between the client's recovery and the lawyer's fee.

Accordingly this Court awards the sum of $14,089.68 (35% of $40,256.25) to Strama against State Defendants (jointly and severally) as and for attorneys' fees and costs. State Defendants are ordered to pay that amount on or before April 18, 1983.

## APPENDIX A

### RESUME

STEPHEN G. SELIGER
33 North Dearborn Street
Suite 2400
Chicago, Illinois 60602
312/630-0075

Admitted to New Jersey (1969) and Illinois (1973) bars.

### WORK EXPERIENCE

*October, 1978 to present:* Engaged in private practice specializing in civil litigation in the federal and state courts and in appellate practice. I handle large civil matters, including a number of class actions. During the years, 1980 and 1981, I was counsel for the Illinois Commission on Delinquency Prevention. The subject matter of the litigation consists of civil rights, employment and housing discrimination and business matters, including securities and other fraud subjects. I have conducted several extended trials on my own.

*July, 1975 to October, 1978:* Associate at Cotton, Watt, Jones, King & Bowlus, One IBM Plaza, Chicago, Illinois 60611. Engaged in civil litigation and labor relations matters, including arbitrations and proceedings before the National Labor Relations Board.

*April, 1973 to April, 1975:* Attorney for the Legal Assistance Foundation of Chicago, involved in general civil practice initially at a neighborhood office on the Southside of Chicago, and then essentially focused on federal class action cases in the areas of prison civil rights, welfare and public housing law. I was co-counsel in *Quern v. Mandley,* 98 S.Ct. 2068 (1978).

*September, 1970 to July, 1972:* Law clerk on the United States Court of Appeals for the Seventh Circuit. From September, 1970 to December, 1971, I clerked for Judge Otto Kerner. For the remainder of my stay, I clerked for Judge Thomas E. Fairchild involved exclusively on the preparation of the opinion in *United States v. Dellinger,* 472 F.2d 340 (7th Cir.1972), the appeal from the Chicago 7 anti-riot act convictions.

*July, 1969 to July, 1970:* Law clerk for Judges Louis Goldman and William E. Peel of the Superior Court of Camden County, New Jersey.

### RELATED ACTIVITIES

In 1980, I authored a portion of the ABA Litigation Section's report on Consumer Rights concerning land fraud litigation and suits under the Consumer Product Safety Act and lectured in November, 1980 at the ABA Litigation Section meeting on these subjects.

In 1979, I taught a seminar in poverty law at I.I.T. Chicago Kent School of Law in Chicago.

I have authored chapters on the legal scene in Chicago in two guidebooks on Chicago, *Sweet Home Chicago* and *Sweet Home Chicago, II.*

During my third year of law school, I was on the staff of the National Commission on the Causes and Prevention of Violence, which studied the riots at the 1968 Democratic National Convention and wrote a report, entitled, *Rights in Conflict.*

### EDUCATION

J.D. cum laude graduate in 1969 of Northwestern University School of Law. I graduated in the upper fifth of the class and was on the dean's list from 1967 to 1969. I was co-editor in chief of the *Journal of Criminal Law, Criminology and Police Science* in 1968 and 1969, and authored an article entitled, "Toward a Realistic Reorganization of the Penitentiaries," which appeared in the Journal, 60 *J.Crim.L.C. & P.S.* 47 (1969).

B.A. degree from the University of Pennsylvania, in Philadelphia. B + average. Political science major.

## APPENDIX B

### AFFIDAVITS OF ATTORNEYS ON REASONABLENESS OF HOURLY RATE SOUGHT BY PLAINTIFF

### AFFIDAVIT

Joan M. Hall, being first duly sworn, desposes and states as follows:

1. I am a partner in the firm of Jenner & Block. I am engaged in a litigation practice. I currently serve as Chairman of the Section of Litigation of the American Bar Association. I am a member of the District Admissions Committee for the Northern District of Illinois and also of the Illinois Supreme Court Committee on Character and Fitness.

2. I am familiar with the fees charged by lawyers in the Chicago area and by the firm of Jenner & Block. I am also familiar with fees awarded in the Northern District of Illinois in antitrust, securities and civil rights cases.

3. I have previously served as defense counsel in a case in which Stephen Seliger represented the plaintiff. Having reviewed the attached resume of Mr. Seliger, being familiar with his work from the prior litigation, and being familiar with the fees charged by lawyers of comparable experience and background, including those at Jenner & Block, I believe that a reasonable fee for Mr. Seliger is at least $125 an hour. Mr. Seliger is a 1969 law school graduate. At Jenner & Block, the regular hourly rate of graduates of the class of 1969 with background and experience comparable to Mr. Seliger is $145.

4. I have also been informed that a portion of his fee application is for work performed conducting a two week jury trial in this case. For this work, I believe a reasonable fee for a lawyer of his background is $160 an hour. The special hourly rate for trial work by Jenner & Block lawyers who graduated in 1969 is $160.

### AFFIDAVIT

Peter B. Freeman, being first duly sworn, deposes and states as follows:

1. I am a partner in the firm of Hopkins & Sutter engaged in a civil litigation practice.

2. I am a 1969 graduate of Harvard Law School, and I was the clerk to Judge Walter J. Cummings, Chief Judge of the United States Court of Appeals for the Seventh Circuit, from 1969 to 1971. Since that time, I have practiced with Hopkins & Sutter. Between 1979 and 1981 I was the Chairman of the Committee on Consumer Rights Litigation of the Litigation Section of the American Bar Association, and since that time I have been Chairman of the Committee on Communications of that Section. I am also a member of the Chicago Bar Association.

3. I am familiar with the fees charged by attorneys in the Chicago area and by the firm of Hopkins & Sutter. I am also familiar with fees awarded by the Circuit Court of Cook County to attorneys representing trustees appointed by the Circuit Court of Cook County.

4. I have known Mr. Seliger since 1970 when we both served as clerks on the United States Court of Appeals and am familiar with his experience, skills and law practice. I believe that a reasonable fee for an attorney of his background, skills and qualifications would be $125.00 to $175.00 per hour.

5. I have also been informed that a portion of his fee application is for work performed conducting a two week jury trial. For this work, I believe a reasonable fee for a lawyer of his background would be $150.00 to $200.00 per hour.

### AFFIDAVIT

James P. Chapman, being first duly sworn, deposes and states as follows:

1. I am an attorney engaged in the practice of law under the firm of James P. Chapman & Associates. My firm is engaged in both civil and criminal litigation.

2. I am familiar with the fees charged by attorneys in the Chicago area and by my firm and others comparable to it. I am also familiar with the fees awarded by the district courts in this District in antitrust, securities and civil rights cases.

3. I have worked with Stephen Seliger in a number of civil cases in the federal and state courts over the past four years and am very familiar with his qualifications, experience and skills.

4. Based upon the above, I believe that a reasonable fee for an attorney of his background and skills to be $125 an hour.

## AFFIDAVIT

Edward T. Stein, being first duly sworn, deposes and states as follows:

1. I am a 1967 graduate of Brooklyn Law School and am engaged in the private practice of law with a partner and two associates in the firm of Singer & Stein. I engage primarily in federal civil rights litigation.

2. I am familiar with fees charged by attorneys in the Chicago area and fees awarded by the courts under 42 U.S.C. § 1988. I received $125 an hour from Judge Perry in *Balark v. Curtin*. I have recently co-authored a law review article on § 1988 attorneys fees for the Loyola Law Review entitled, *An Examination of the Proportionality Test in Section 1988 Fee Awards,* for its fall publication.

3. I have known Stephen Seliger for the past 13 years and am very familiar with his background, skills and qualifications. We have worked on a number of matters together, and I have consulted with him on various legal issues.

4. Based upon my experience and knowledge of the fees charged by attorneys in the Chicago area and of awards in reported § 1988 cases, I believe that a reasonable fee for Mr. Seliger is $125–150 an hour.

## AFFIDAVIT

Thomas H. Morsch, being first duly sworn, deposes and states as follows:

1. I have been engaged in the practice of law in the City of Chicago for more than twenty-five years. During this period I have handled a number of cases in the United States District Court for the Northern District of Illinois. I am a fellow of the American College of Trial Lawyers and the partner in charge of the general litigation practice at the firm of Sidley & Austin.

2. I am familiar with the fees charged by lawyers in the Chicago area and by the firm of Sidley & Austin. I am also familiar with fees awarded in the Northern District of Illinois in antitrust, securities and civil rights cases.

3. I am aware of the professional services performed by Stephen G. Seliger in the above-entitled matter and have been informed of his professional background and experience.

4. Based upon the foregoing and upon my familiarity with the fees charged by lawyers of comparable background and experience, including lawyers at Sidley & Austin, I believe that a reasonable fee for Mr. Seliger's work is in the range of $115 to $135 per hour. Since a substantial part of his work was conducting a two week jury trial, an hourly rate near the top of the range would be reasonable.

## AFFIDAVIT

Barry T. McNamara, being first duly sworn, deposes and states as follows:

1. I am a partner in the firm of D'Ancona & Pflaum, engaged in a litigation practice. I am a 1969 graduate of Northwestern University School of Law, in the same class as Stephen Seliger.

2. I have known Mr. Seliger since law school and am familiar with his experience, skills and qualifications, including the cases he has tried and the appeals he has handled. During the years 1980 and 1981, Mr. Seliger served as counsel for the Illinois Commission on Delinquency Prevention of which I was chairman.

3. I am familiar with the fees charged by attorneys in the Chicago area and by my firm and others comparable to it for the

conduct of serious litigation. Based upon this knowledge, I believe a reasonable fee for Mr. Seliger's services for litigation work is $135.00 per hour.

4. I have also been informed that a portion of his fee application in this case is for work performed conducting a jury trial for approximately two weeks. For this work, I believe a reasonable fee for Mr. Seliger is $135.00 an hour.