**David HUEBSCHEN, Plaintiff,**

v.

**DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Secretary Donald Percy, Robert Cohen, Bernard Stumbras, Jane Roe, and the United States Government, Defendants.**

**No. 81–C–1004.**

United States District Court, W. D. Wisconsin.

Sept. 7, 1982.

As Amended Sept. 21, 1982.

Michael R. Fox, Madison, Wis., for plaintiff.

Robert D. Repasky, Asst. Atty. Gen., Madison, Wis., for defendants.

DECISION AND ORDER

SHABAZ, District Judge.

Plaintiff David Huebschen has brought this action under Title VII, Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and under 42 U.S.C. § 1983, requesting damages and equitable relief for alleged sexual harassment. Jurisdiction is based on 42 U.S.C. § 2000e–5 and 28 U.S.C. § 1343.

In his complaint, plaintiff alleged that he was an employee of the State of Wisconsin; that while serving as a probationary supervisor in the Bureau of Social Security and Disability Insurance (BSSDI), his immediate supervisor was defendant Jacquelyn Rader (denominated in the caption as Jane Roe); that Ms. Rader terminated his probation, causing his demotion to a non-supervisory position, because he refused to continue a sexual relationship with her.

Plaintiff further alleged that defendant Bernard Stumbras, Ms. Rader's supervisor, knew about the harassment, but upheld the termination.[1] Plaintiff claimed that these acts denied his right under Title VII to be free from discrimination and denied him due process of the law. The due process claim was dismissed prior to trial.

After a four-day trial on liability, the jury[2] returned a verdict in favor of plaintiff and against defendants Rader and Stumbras[3] by its answers to the following special verdict questions:

> In the event you determine that defendant Rader made demands of a sexual nature on plaintiff, was plaintiff's refusal to submit to these demands a motivating factor in the decision to terminate plaintiff's probation?

Answer: Yes.

> Would plaintiff's probation have been terminated in the absence of the sexual harassment?

---

1. Several other defendants were dismissed prior to trial. The Court dismissed Donald Percy, Secretary of the Department of Health and Social Services, during trial because plaintiff failed to show Mr. Percy's personal involvement in any of the alleged events.

2. The jury verdict controlled the claim under § 1983, but was merely advisory to the Court on the Title VII claim. *See* Part II.

3. The jury found that Robert Cohen, Director of BSSDI, was not liable, and judgment was subsequently entered in his favor.

Answer: No.

In addition, the jury found both Ms. Rader and Mr. Stumbras personally and directly responsible for the impermissible termination, and that these defendants were not acting in good faith performance of their duties.

After two more days of testimony in the damage phase of the trial, the jury returned a verdict assessing the following punitive and compensatory damages:

| | |
|---|---|
| Bernard Stumbras: | $45,000 compensatory damages |
| | 36,900 punitive damages |
| Jacquelyn Rader: | $90,000 compensatory damages |
| | 24,600 punitive damages |

The Court approved the form of the judgment on July 27, 1982.[4] *See* Rule 58(2), Federal Rules of Civil Procedure. Defendants accepted the jury verdict as to the Title VII claim as well, stipulating that plaintiff be reinstated at an equivalent position and be awarded back pay of $7,913.64. The Court also awarded plaintiff $21,726 in attorney's fees.

Defendants have now filed a number of post-verdict motions and plaintiff seeks increased attorney's fees and costs.

## I. MOTION FOR JUDGMENT NOT-WITHSTANDING THE VERDICT

Defendants have filed a motion for judgment notwithstanding the verdict, alleging that: 1) compensatory and punitive damages are not available in this case; 2) the verdict against defendant Rader is not supported by the evidence; and 3) the verdict against defendant Stumbras is not supported by the evidence. For the reasons that follow, the motion is granted as to defendant Stumbras and, in all other respects, denied.

**4.** The parties stipulated that the judgment against defendants Rader and Stumbras be entered in their official capacities.

**5.** Plaintiff alleged a due process violation in his complaint. However, plaintiff stipulated to summary judgment dismissing this claim prior to trial. In addition, plaintiff attempted to amend the complaint during trial to add claims based on due process and equal protection.

### A. *Availability of compensatory and punitive damages*

Defendants first argue that compensatory and punitive damages may not be recovered where plaintiff bases his claim under 42 U.S.C. § 1983 on a violation of Title VII.

■ ''The Court notes, as a preliminary matter, that 42 U.S.C. § 1983 is not a source of substantive rights. *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 617–618, 99 S.Ct. 1905, 1915–1916, 60 L.Ed.2d 508 (1979) ("§ 1983 by itself does not protect anyone against anything"). Instead, plaintiff needed to show that he was deprived of "rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. In other words, no remedy is available under § 1983 unless plaintiff also shows a violation of a constitutional provision or federal law.

■ Title VII was the only substantive basis of the § 1983 claim.[5] Under Title VII, a complainant may recover only back pay and equitable relief, 42 U.S.C. § 2000e–5(g), and has no right to a trial by jury. *Equal Employment Opportunity Comm'n v. Detroit Edison,* 515 F.2d 301 (6th Cir. 1975), *vacated and remanded on other grounds,* 431 U.S. 951, 97 S.Ct. 2669, 53 L.Ed.2d 267 (1977). However, under § 1983, compensatory and punitive damages may be awarded. *See Carey v. Piphus,* 435 U.S. 247, 256–257 n. 11, 98 S.Ct. 1042, 1048–1049 n. 11, 55 L.Ed.2d 252 (1978).

To support their contention that plaintiff may not recover compensatory and punitive damages under § 1983 where the sole basis for the § 1983 claim is a violation of Title VII,[6] defendants rely on *Great American*

Motions to this effect were denied because the evidence presented at trial did not substantiate the claims.

**6.** Although it appears that this issue should have been presented as a motion to dismiss under Rule 12(b)(6), Federal Rules of Civil Procedure (for failure to state a claim for which relief can be granted), this contention was first made during the damage phase of the bifurcat-

*Federal Savings & Loan v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979) and *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). According to defendants, these cases imply that the comprehensive remedial framework of Title VII precludes a § 1983 claim based solely on Title VII.

■ This contention is not without some merit. The plaintiff in *Novotny* based a claim under 42 U.S.C. § 1985(3) exclusively on a violation of Title VII. Like § 1983, § 1985(3), the statute outlawing private conspiracies to violate constitutional rights, creates no substantive rights. 442 U.S. at 372, 99 S.Ct. at 2349 ("it merely provides a remedy for violation of the rights it designates"). The Supreme Court reasoned that such a § 1985(3) action would avoid the comprehensive procedural and remedial purposes of Title VII. The following language from *Novotny* is illustrative:

> If a violation of Title VII could be asserted through § 1985(3), a complainant could avoid most if not all of these detailed and specific provisions of the law. Section 1985(3) expressly authorizes compensatory damages; punitive damages might well follow. The plaintiff or defendant might demand a jury trial. The short and precise time limitations of Title VII would be grossly altered. Perhaps most importantly, the complainant could completely bypass the administrative process, which plays such a crucial role in the scheme established by Congress in Title VII.

442 U.S. at 375–376, 99 S.Ct. at 2350–2351 (footnote omitted). In *Sea Clammers,* the Supreme Court suggested in dicta that the same analysis was proper in a suit brought under § 1983.

> When the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate

congressional intent to preclude the remedy of suits under § 1983.

453 U.S. at 20, 101 S.Ct. at 2626.

■ Absent other precedent, it would appear that the *Novotny* rationale should apply with equal force to plaintiff's claim under § 1983. The remedial framework of Title VII is equally circumvented whether the action is brought under § 1985(3) or under § 1983. The Court indeed finds it anomalous that plaintiff may recover punitive and compensatory damages, as well as receive a trial by jury simply because he works for the state. Employees in the private sector cannot do so because their rights are not violated under color of state law, nor do federal employees have these additional rights. *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976).

After examining the various opinions in these cases and considering other precedent, the Court concludes that defendants' argument must fail. In *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Supreme Court held that § 1983 encompasses virtually all congressional enactments by virtue of the phrase "and laws" in the statute. *See also Newport v. Facts Concerts,* 453 U.S. 247, 270, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981). Even the dissenters in *Maine* believed that § 1983, by the term "and laws," included violations of equal rights legislation:

> The only firm basis for decision is the historical evidence, which convincingly shows that the phrase the Court now finds so clear was—and remains—nothing more than a shorthand reference to equal rights legislation enacted by Congress. To read "and laws" more broadly is to ignore the lessons of history, logic, and policy.

*Maine,* 448 U.S. at 12, 100 S.Ct. at 2508 (Powell, J., dissenting).[7] Obviously, Title VII is equal rights legislation.

---

ed trial. The timing of the motion is questionable in that the impaneling of a jury would have been unnecessary if defendants' argument were correct. The Court will nevertheless reach the merits of defendants' arguments at this time.

7. This view is repeatedly reinforced throughout the dissenting opinion. *Id.* 448 U.S. at 16 and 22, 100 S.Ct. 2510 and 2513.

In *Johnson v. Railway Express,* 421 U.S. 454, 459, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975), the Supreme Court unequivocally held that Title VII is not an exclusive remedy, but is co-extensive with other statutes. In *Johnson,* plaintiff sued under 42 U.S.C. § 1981 and Title VII after the applicable statute of limitations on the § 1981 claim had expired. Justice Blackmun, writing for the Court, rejected plaintiff's argument that the § 1981 statute of limitations should be tolled during the pendency of his Title VII claim. Instead, the Supreme Court concluded that the two claims were totally independent, and therefore plaintiff had slept on his rights under § 1981. The Court was aware that such a holding, in the ordinary course of events, would benefit the civil rights claimant. *Id.* at 465–466, 95 S.Ct. at 1722–1723. Defendants' argument, in stressing the comprehensiveness of Title VII, is merely a shorthand way of asserting the exclusiveness of the Title VII remedy. This directly contradicts the holding of *Johnson.*

Citing *Johnson,* the Court of Appeals for the Ninth Circuit held that the joining of actions under Title VII and § 1983 did not preclude an award of punitive damages. *Bradshaw v. Zoological Society of San Diego,* 569 F.2d 1066 (9th Cir. 1978). The plaintiff in *Bradshaw* alleged sexual discrimination and retaliation, apparently without basing the § 1983 claim on a constitutional ground. Therefore, *Bradshaw* seems to encompass the circumstances of this case as well.

Furthermore, a careful reading of all of the opinions in *Novotny* provides sufficient reason to limit its holding to the interplay between Title VII and 42 U.S.C. § 1985(3). The three dissenters clearly would allow a § 1985(3) claim (and, by implication, a § 1983 claim) to be based entirely on a violation of Title VII:

**8.** *See also Sea Clammers,* 453 U.S. at 22, 101 S.Ct. at 2627 (Stevens, J., concurring in part and dissenting in part).

**9.** *See also* C. Richey, *Manual on Employment Discrimination and Civil Rights Actions in the Federal Courts,* page A18 and Section D[2],

Thus, while it may be that in many cases persons seeking redress under § 1985(3) also have a claim directly under Title VII, this is not sufficient reason to deprive those persons of the right to sue for the compensatory and punitive damages to which they are entitled under the post-Civil War statute.

*Novotny,* 441 U.S. at 391–392, 99 S.Ct. at 2358–2359 (footnotes omitted) (White, J., dissenting).

Justices Powell and Stevens, concurring in *Novotny,* reasoned that § 1985(3) proscribed only conspiracies to deny constitutionally guaranteed rights, but not rights created by statute:

> For essentially the reasons suggested by Mr. Justice Stevens, I would hold that [the reach of] § 1985(3) ... is limited to conspiracies to violate those fundamental rights derived from the Constitution.

*Id.* at 379, 99 S.Ct. at 2352 (Powell, J., concurring). Given the fact that Justice Stevens joined the Court's opinion in *Maine,*[8] and considering Justice Powell's rationale in dissent in that case, it appears that at least five justices would rule that a Title VII violation alone may provide the substance for an action under § 1983.

Simply put, both *Novotny* and *Sea Clammers* should be limited to the interplay of the statutes involved in those cases: § 1985(3) and Title VII in *Novotny,* and § 1983 and the environmental statutes in *Sea Clammers.* These cases do not control under the circumstances presented by this case.[9]

Therefore, defendants' motion for judgment notwithstanding the verdict on this ground must be denied.

**B.** *Verdict as to Ms. Rader's Liability*

Defendants next argue that the verdict as to Ms. Rader's liability is unsupported by the evidence.

(Federal Judicial Center, revised, 1981). *Contra, LeBoeuf v. Ramsey,* 503 F.Supp. 747, 754 (D.Mass.1980). *And see also Woerner v. Brzeczek,* 519 F.Supp. 517, 519, n. 2 (N.D.Ill. 1981); *Hall v. Bd. of County Comm'rs,* 509 F.Supp. 841, 848 (D.Md.1981).

■ In deciding whether a verdict is supported by the evidence, the Court must apply the following standard:

> [T]he motion should be denied where the evidence, along with all inferences to be reasonably drawn therefrom, when viewed in the light most favorable to the party opposing such motion, is such that reasonable men in a fair and impartial exercise of their judgment may reach different conclusions.

*Kolb v. Chrysler Corp.,* 661 F.2d 1137, 1140 (7th Cir. 1981); *Funk v. Franklin National Life,* 392 F.2d 913, 915 (7th Cir. 1968).

■ Judged by the *Kolb* standard, the evidence supports the jury's verdict as to Ms. Rader's liability. The jurors were entitled to believe plaintiff's testimony: that he and Ms. Rader had a consensual sexual relationship during Fall, 1979; that plaintiff, on November 12, 1979, told Ms. Rader that the sexual relationship should end; that one week later, despite her previous favorable evaluations of plaintiff's work, Ms. Rader informed plaintiff that she was attempting to extend his probation and wished to delay a final determination of whether he should be granted permanent supervisory status; and, that when she failed to receive approval for such an extension, Ms. Rader terminated plaintiff's probation in mid-December.

Defendants insist, however, that plaintiff offered no testimony of any specific demands for sexual activity subsequent to November 12, 1979, the time at which, according to plaintiff, the relationship ceased to be consensual. This contention must fail for a basic reason. Plaintiff did not need to prove that any specific and overt demands were made. Instead, he had to demonstrate that his probation was terminated for a discriminatory, and therefore impermissible,

reason. *Mt. Healthy v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).[10] In other words, he had to show that his refusal to continue a sexual relationship motivated the decision to demote him.

Plaintiff sufficiently carried his burden by the following testimony:

MR. FOX: What occurred then? [shortly after December 6, 1979 and subsequent to his termination notice]

MR. HUEBSCHEN: I was still in my office since I was still officially at least a supervisor and I received a phone call and was told to come to her [Ms. Rader's] office right away.

MR. FOX: And why were you called to her office?

MR. HUEBSCHEN: When I came there she said that she wanted to warn me that I had better never discuss the true circumstances of my demotion and that if I did she would make sure that I lost all of my friends and everybody knew that I was a chronic liar.

Tr. Huebschen testimony, July 14, page 67. This testimony reinforces other significant evidence from which the jury might infer that Ms. Rader's action was based on an impermissible reason. Since this case turned almost completely on the credibility of plaintiff and Ms. Rader,[11] the application of the test enunciated above compels the denial of this motion. A reasonable juror could, from all of the evidence, conclude that plaintiff was demoted because he refused to continue a sexual relationship with Ms. Rader.

Whether plaintiff's demotion was justified regardless of the influence of the impermissible reason (proof of which was defendants' burden under *Mt. Healthy*) was the subject of significant evidence from both sides. Plaintiff introduced a generally

---

**10.** Defendants do not challenge plaintiff's implicit assumption that sexual harassment is sex-based discrimination within the ambit of Title VII. The Court therefore will not face the issue, but notes that this assumption is a matter of some dispute. Recent cases, however, support the view that sexual harassment is sexual discrimination. *Bundy v. Jackson,* 641 F.2d 934 (D.C.Cir.1981); *Tomkins v. Public*

*Service Electric,* 568 F.2d 1044 (3rd Cir. 1977). *See also Munford v. James T. Barnes & Co.,* 441 F.Supp. 459 (E.D.Mich.1977) for an overview of earlier cases facing this issue.

**11.** Ms. Rader not only denied the exchange quoted above, but also the existence of any romantic or personal relationship with plaintiff.

favorable performance evaluation from August, 1979; his own testimony of his overall work record and conscientious efforts to improve his performance; and, significantly, the uniformly unfavorable performance evaluation prepared subsequent to the decision to demote. Plaintiff contrasted this last item to the results of an investigation carried out under the direction of defendant Bernard Stumbras. The investigation revealed both positive and negative performance information. Therefore, aside from plaintiff's testimony about his generally good work record, the jury did have evidence from which it could infer that criticisms of plaintiff's performance were a pretext. The fact that under Wisconsin law a probationary employee *could be* terminated for any reason does not compel a different conclusion. The question is whether plaintiff's probation *would have been* terminated absent the sexual harassment. Reasonable jurors might differ on this question, but the *Kolb* standard does not allow this Court to overturn this portion of the verdict.

#### C. *Verdict as to Mr. Stumbras' Liability*

■ Defendants urge that the Court set aside the jury verdict against defendant Stumbras. Because he acted in good faith reliance on the advice of an attorney, defendants' motion as to Mr. Stumbras is granted.[12]

■ A significant portion of the evidence concerning Mr. Stumbras' actions is undisputed. He is the Administrator of the Division of Economic Assistance of the Department of Health and Social Services. The Bureau of Social Security and Disability Insurance, where plaintiff and Ms. Rader worked, is an agency within the Division of Economic Assistance. In January, 1980, shortly after plaintiff's demotion, plaintiff wrote a letter to Mr. Stumbras and Mr. Stumbras' superior,[13] complaining that his demotion resulted from sexual harassment. Mr. Stumbras consulted with a Department attorney. The attorney advised him that if the sexual harassment charge had any merit, Mr. Stumbras should forego an investigation of the charge in favor of the state's Personnel Commission, the agency equipped to handle such matters. In that event, the attorney continued, he should confine his investigation to whether or not the demotion was justified by work-related factors, that is, those matters within his expertise. Mr. Stumbras then interviewed plaintiff and Ms. Rader and found that their stories conflicted. Mr. Stumbras ordered an investigation into the justification for the demotion. Based on information from the investigation, and other factors, Mr. Stumbras concluded that the demotion was justified by evidence unrelated to any possible sexual relationship between plaintiff and Ms. Rader.

Plaintiff attacked that conclusion with obvious success before the jury. However, plaintiff provided no evidence that Mr. Stumbras exerted any pressure on the investigators or attempted to foreordain the conclusion. Whether or not Mr. Stumbras' conclusion was correct, the Court has no evidence to infer any wrongdoing because of it.

One other piece of evidence also may have had a significant impact on the jury. Plaintiff asserted strongly that Mr. Stumbras' failure to fully investigate the specifics of the sexual harassment charge was evidence of his liability. In fact, Mr. Stumbras did exactly what the Department's attorney recommended. If good faith immunity is available, then Mr. Stumbras' failure

---

**12.** Defendants also strenuously argue that the evidence shows no personal involvement by Mr. Stumbras because he did not take part in the sexual harassment. The argument is totally without merit. Liability depends upon whether the demotion was motivated by an impermissible reason. Mr. Stumbras admitted on the stand that once the demotion was challenged, the ratification of the demotion was his decision to make. That is sufficient personal involvement.

**13.** Donald Percy, Secretary of the Department of Health and Social Services was dismissed from the case at the close of plaintiff's evidence. *See* Note 1.

to investigate the harassment charge cannot be considered probative.[14]

The Supreme Court recently summarized the standard for the good faith defense:

> We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).[15]

Mr. Stumbras' reliance on the advice of counsel under these circumstances established a good faith defense which plaintiff did not significantly rebut. While an employer may have a duty to investigate charges such as the one brought by plaintiff,[16] the employer here is the state. The attorney advised that Mr. Stumbras leave the investigation of sexual harassment to another state agency. Since such an investigation was undertaken, the duty to investigate was met. In short, Mr. Stumbras, in relying on the attorney's advice, did exactly what a "reasonable person" would have done.

In addition, *Mt. Healthy* instructs the employer to examine the complainant's performance to see whether the employment action taken was justified regardless of the charge of discrimination. On that fact, after all, the employer's liability rests. Mr. Stumbras' reliance on the attorney's advice was, therefore, not only reasonable, but probably correct.

■ The Court must conclude, then, that Mr. Stumbras established the defense of good faith, that the defense was not rebutted, and that Mr. Stumbras deserves judgment notwithstanding the verdict. Therefore, defendants' motion as to Mr. Stumbras will be granted.[17]

---

**14.** Plaintiff suggested during argument that Mr. Stumbras had threatened plaintiff with retaliation if he took his charge to the Personnel Commission. The Court finds that the evidence of such alleged retaliatory threat is too weak to overcome Mr. Stumbras' good faith defense. Furthermore, no retaliatory acts were alleged.

**15.** *See also Chavez v. Rowe,* 643 F.2d 1281 (7th Cir. 1981), *cert. denied,* 454 U.S. 907, 102 S.Ct. 415, 70 L.Ed.2d 225 (1981).

**16.** *See Munford v. James T. Barnes & Co.,* 441 F.Supp. 459 (E.D.Mich.1977).

**17.** The Court notes that, although plaintiff did not raise the issue in his response to the defendants' motions, Rule 50(b), Federal Rules of Civil Procedure, provides that motions for judgment notwithstanding the verdict must be preceded by, and predicated upon the same grounds as, motions for directed verdict made at the close of all of the evidence. Defendants moved for a directed verdict in favor of Mr. Stumbras at the close of plaintiff's evidence, basing that motion on lack of personal involvement. The motion was not renewed at the close of all of the evidence, although defendants insisted on a good faith instruction to the jury. Furthermore, defendants moved for directed verdict during the damage portion of the trial (albeit on a ground unrelated to the good faith defense). Defendants' post-trial motion does assert the good faith defense.

The Court finds that defendants' failure to renew the directed verdict motion at the close of the evidence and to assert good faith as the ground would be insufficient to comply with the literal language of the rule. However, the Court of Appeals has instructed district courts to avoid an overly rigorous or inflexible approach to the rule. *Bonner v. Coughlin,* 657 F.2d 931 (7th Cir. 1981). The application of the rule

> should be examined in the light of the accomplishment of [its] particular purpose as well as in the general context of securing a fair trial for all concerned in the quest for truth.

*Id.* at 939.

In an earlier case the Court of Appeals stated:

> Where the court's attention is directed to a party's contention that the pertinent evidence presented entitled it to judgment as a matter of law, the motion's purpose is served.

*Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc.,* 585 F.2d 821, 825 (7th Cir. 1978), *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979).

The Court concludes that defendants' insistence on the good faith instruction did indeed direct the Court's attention to the issue. Moreover, the reasonableness of acting on an attorney's advice and the ends of securing a fair trial and substantial justice between the parties are served by flexibility concerning the requirements of Rule 50(b). These factors militate in favor of reaching the merits of the motion after verdict, as the Court has done.

## II. MOTION TO ALTER OR AMEND THE JUDGMENT

Defendants have moved to alter or amend the judgment entered against the Department of Health and Social Services. Because counsel for the Department stipulated to that judgment, the motion will be denied.

As noted earlier, this case proceeded under Title VII and under 42 U.S.C. § 1983. Prior to the jury trial on the § 1983 cause of action, the Court informed the parties that the jury verdict as to § 1983 would be advisory to the Court on the Title VII claim. The Title VII claim against the Department was tried to the Court at the same time that the § 1983 action was tried before the jury.

When the parties appeared before the Court after trial to enter the form of judgment, and before the Court made any findings concerning the Title VII action, defendants' counsel made it clear that he did not dispute the amount of back pay due plaintiff. Furthermore, except for some discussion about the wording, he did not dispute the position to be offered to plaintiff. He stated:

MR. REPASKY: ... I would only suggest that perhaps there would be some time frame in there, perhaps within 30 days or so, so that the proper position—position that would be suitable could be determined. We will tender—We don't have any intention to seek a stay of that portion of the order, Your Honor.

Tr. Proceedings of July 21, 1982, page 4.

On July 27, 1982, after certain problems concerning the form of the verdict were resolved, the following exchange took place with regard to the tender of a job to plaintiff:

THE COURT: Then the first portion of the judgment to be entered upon the stipulation of the parties, the proposed language of that judgment will read as follows: Again, I would refer this to the Department. It would be my suggestion that this, of course, be the order to be approved or the judgment to be approved and portions of this would relate to the Department of Health and Social Services rather than to the individual defendants which are named.

MR. REPASKY: I think that is true, Your Honor.

THE COURT: The order of the Court would be that the defendant, Department of Health and Social Services, shall tender an equivalent level position at Range 15 in the Wisconsin Civil Service to plaintiff David Huebschen. Pending the tendering of such position, plaintiff shall be entitled to receive additional back pay for the difference between his present position and the pay at a Range 15 position from the date of this order, July 27, 1982, through the date such a position is tendered. With that agreement, gentlemen, that will be the first part of this judgment to be entered in this matter. Mr. Repasky, is that agreeable with you?

MR. REPASKY: The language is agreeable.

Tr. Proceedings of July 27, 1982, pages 5–6.

Shortly thereafter, the following ensued concerning back pay:

THE COURT: Again then based upon the stipulation of the parties back pay will be ordered as part of this judgment to be paid by the Department of Health and Social Services in the amount of $7,913.64

. . .

Tr. Proceedings of July 27, 1982, page 8. The discussions preceding these statements on the record left the Court with no doubt that, as it concerned the Title VII cause of action, defendants stipulated to judgment against the Department.

Accordingly, the motion to alter or amend the judgment against the Department of Health and Social Services must be denied.

## III. MOTION FOR A NEW TRIAL

Defendants have also moved for a new trial, citing numerous grounds for their motion. The motion is granted in part, and the Court orders a new trial on damages unless plaintiff accepts a reduced award of $10,000 in compensatory damages and $15,-

000 in punitive damages. Before addressing the excessiveness of the damages awarded, the Court will briefly discuss three other reasons that defendants claim entitles them to a new trial.

### A. Juror's Prejudice Due to her Previous Knowledge of Certain Defendants

Defendants first assert that a new trial should be granted because a juror allegedly failed to divulge previous knowledge of certain defendants. Defendants base their contention on the affidavit of Robert Cohen, one of the defendants.[18] In the affidavit, Mr. Cohen claims that he was made aware, near the close of the trial, that juror Mrs. Mary Coakley is the sister of an employee of the Bureau of Social Security and Disability Insurance (BSSDI). Plaintiff and defendants Rader and Cohen are among the employees at BSSDI. Furthermore, according to the affidavit, Jacquelyn Rader, one of the defendants, denied a promotion to Mrs. Coakley's brother. Therefore, defendants argue, Mrs. Coakley was biased, and a new trial should be ordered.

The transcript of the voir dire, which defendants' attorney apparently failed to consult, convinces the Court that defendants' claim of possible juror prejudice is without merit. After Mrs. Coakley responded to questions concerning her employment and her husband's employment, the following exchange ensued:

THE COURT: And I believe Mrs. Coakley indicated that Voc Rehab, is that your husband's employment?

MRS. COAKLEY: Yes, and I have a brother who works for SSDI, Social Security.

THE COURT: Disability?

MRS. COAKLEY: Yes.

Tr. Jury Selection, July 12, page 10.

Thereafter, all jurors, including Mrs. Coakley, answered the following question in the negative:

Have any of you or your close relatives or friends ever been demoted from a position or denied a promotion or disciplined during the course of your profession or occupation or work?

Tr. Jury Selection, July 12, page 11.

At the completion of the voir dire, the Court held a brief bench conference. The following occurred:

THE COURT: Do you have any that you would like to have stricken for cause?

MR. REPASKY: No, sir, but there's one that I would ask some additional questions be phrased to and that is the woman who is the secretary. I'd be interested if she has discussed this case with the people who are employed with Mr. Fox and work in his office.[19]

. . . . .

MR. REPASKY: Other than that I have nobody that I would strike for cause.

Tr. Jury Selection, July 12, page 13.

Mr. Repasky requested no follow-up questions of Mrs. Coakley. He neither challenged Mrs. Coakley for cause, nor exercised a peremptory challenge on her.

Aside from the obvious weaknesses in Mr. Cohen's affidavit,[20] this Court believes that Mr. Repasky's failure to request further interrogation of Mrs. Coakley during voir dire is fatal to an objection raised in a post-trial motion.[21] Counsel had notice of Mrs. Coakley's brother at the appropriate time and did nothing to investigate the matter then. Simply requesting that Mrs.

---

18. The jury did not find Mr. Cohen liable for any wrongdoing.

19. The additional questions were directed to a juror who was a legal secretary in an office adjoining that of Mr. Fox, plaintiff's attorney. She denied having discussed the case with him, and was not the subject of a challenge for cause or a peremptory challenge.

20. The affidavit was based on uncertain information and clearly relies on hearsay.

21. Mr. Repasky did raise the issue during the damage phase of the trial, but only mentioned that he had recently discovered that the juror's brother worked in the same office as plaintiff and some of the defendants. Mrs. Coakley divulged that fact during voir dire. Raising the issue during the latter part of the trial is just as untimely as raising it after the verdict.

Coakley reveal her brother's name would have sufficiently informed defendant Rader (who was present during voir dire) whether or not she knew Mrs. Coakley's brother.

The fact that Mrs. Coakley did not answer the later question about whether a close relative or friend had been denied a promotion does not compel a different conclusion. Mrs. Coakley may not have known or remembered that her brother had been denied a promotion. Promotion possibilities are recurring events in state employment. In fact, plaintiff contends that Mrs. Coakley's brother was later promoted by Ms. Rader.

The Court is not convinced that Mrs. Coakley was biased or prejudiced. Knowledge of the identity of her brother might have given defendants reason to suspect prejudice, but their failure to request follow-up questions during voir dire precludes serious entertainment of an objection raised at this time.

> It was the duty of counsel to ascertain by proper examination at the time the jury was impaneled, the existence of any ground of objection to the jurors, and failing to do so, he cannot thereafter raise any objection which might have been discovered and seasonably presented to the trial court.

*Union Electric Light and Power Co. v. Snyder Estate Co.,* 65 F.2d 297, 301 (8th Cir. 1933). *See also United States v. Ragland,* 375 F.2d 471 (2d Cir. 1967), *cert. denied,* 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968).

### B. *Hearsay Objections*

█ Defendants next argue that the Court committed prejudicial error by allowing a number of witnesses to testify to plaintiff's out-of-court statements. These witnesses testified that plaintiff had told them that plaintiff was having an affair with defendant Rader, or that plaintiff had been subjected to comments from Ms. Rader with suggestive sexual content. The witnesses also testified that plaintiff was

bothered or confused by such actions on the part of his superior. The witnesses often illustrated their testimony with comments made by plaintiff which left them with these impressions. Defendants frequently objected to such testimony, asserting that the statements were hearsay. The Court overruled the objections while admonishing the jury that the witnesses' testimony should be considered only as evidence that plaintiff had made such statements, not as evidence of the truth of the statements.

The Court held, and continues to hold, that the testimony was admissible on two grounds: first, the evidence was not offered for the truth of the matter asserted, thus not constituting hearsay under Rule 801(c), Federal Rules of Evidence; and second, the statements were not hearsay by virtue of Rule 801(d)(1)(B), Federal Rules of Evidence, which states:

> A statement is not hearsay if—
> The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive ...

As previously pointed out, the case depended, to an unusual degree, on the jury's impressions of the credibility of the two principals, Ms. Rader and plaintiff. Defendants implied that plaintiff was not telling the truth or fabricated his affair with Ms. Rader. The challenged testimony was offered, and tended to prove, that plaintiff spoke to others about his relationship with Ms. Rader long before he had any reason to invent the story because his job was in danger. Thus, the statements were clearly admissible.

Furthermore, any possible prejudice was overcome by a very specific cautionary instruction to the jury prior to their deliberations, which the Court inserted because of the large number of such statements elicited by both parties.[22] After discussing the

---

**22.** The Court finds Mr. Repasky's discussion of this issue surprising, considering the number of similar statements he elicited from witnesses.

unreliability of hearsay, the instruction read:

> . . . At times during the trial, I permitted certain questions to be answered despite an objection by counsel that hearsay would be involved. I allowed those questions to be answered only for the limited purpose of establishing that the statement was, in fact, made. The statements were not admitted, and should not be considered as evidence of the actual events themselves.
>
> For example, if the witness in a trial testifies "Jones told me he went to the baseball game on July 14th," I would permit you, the jury, to consider this statement only as it tends to show that Jones *said* he went to the baseball game. It would not be admissible evidence of whether Jones actually attended the baseball game. His attendance would need to be proved through other, non-hearsay, evidence.

Therefore, this ground for a new trial must be rejected.

### C. *Closing Argument*

Defendants next argue that plaintiff's counsel's closing arguments to the jury justify a new trial. Specifically, defendants contend that Mr. Fox misstated testimony concerning a meeting between plaintiff and Ms. Rader. The Court cannot imagine of what defendants complain, as counsel has not specifically delineated which statements are objectionable. After reviewing the closing arguments of the parties, the Court can find only one dispute about this meeting, and that dispute concerns its timing. Defense counsel asserted that the meeting could not have occurred when plaintiff said it did because Ms. Rader had proved she was elsewhere. Tr. Closing Arguments, July 16, page 49. Plaintiff's counsel merely pointed out that plaintiff testified that the meeting took place late in the afternoon—about 4:00 P.M.—or early enough for Ms. Rader to have attended the meeting and to have reached her destination after 6:00 P.M. Tr. Closing Arguments, July 16, pages 73–74. *See* Tr. Huebschen testimony, July 13, page 86.

Defendants also claim that plaintiff's counsel quoted testimony that was excluded by the Court. This assertion apparently refers to plaintiff's counsel's use of the term "garbage" to describe defendants' attitude toward plaintiff. Tr. Closing Arguments, July 20, pages 55, 57. Plaintiff's counsel did use this term in closing arguments during the damage phase of the trial, without reference to the source of the term. The term was first introduced in testimony by plaintiff, describing the comments of Mr. Cohen, a defendant against whom no liability was found. The Court excluded the testimony.

The jury possibly recognized the source of the word and attributed the attitude it exemplified to the other defendants. However, the jury more likely considered the term "garbage" in the usual derogatory vernacular, without any thought to the earlier excluded testimony. At any rate, the Court gave a cautionary instruction, sufficient to dispel any prejudicial impact.

Defendants also claim that plaintiff's counsel's arguments contained appeals to passion and prejudice against the government.

Elsewhere in this opinion, the Court concludes that the jury was not so inflamed by passion and prejudice to warrant a new trial. See Part III D. Plaintiff's counsel's argument, while improper, was not so inflammatory as to constitute grounds for granting a new trial.

The statement which precipitated defendants' objection was as follows:

MR. FOX: What did that do him as a man? What did that do to him as a human being, and what does that demonstrate to you about government?

The government for two and a half years has dragged this individual. For two and a half years they have not listened to him.

Tr. Closing Arguments, July 20, page 6.

The Court sustained defendants' objection and now recognizes that a number of Mr. Fox's subsequent comments bordered

on impropriety, but did not cross the line from merely vigorous representation. One possible exception is Mr. Fox's comment that defendants were represented by the attorney general's office. Tr. Closing Arguments, July 20, page 51. However, the jurors knew this fact since the beginning of the trial when the attorneys introduced themselves, and any negative inference was already available to the jury.

The impropriety of the statement quoted above was remedied by a quick objection. The rest of the questionable comments, considered in the context of the entire argument, were not so egregious as to warrant a new trial. The cases cited by defendants are not really on point at all. In *Draper v. Airco, Inc.,* 580 F.2d 91 (3d Cir. 1978), the Court ordered a new trial because of repeated, pointed and insulting comparisons of the wealth of the parties. Mr. Fox's remarks just don't rise to this level of impropriety. In *Haber v. County of Nassau,* 557 F.2d 322 (2d Cir. 1977), the Court awarded a new trial, not because of counsel's prejudicial remarks, but because of the improper joinder of a municipal corporation which the jury apparently believed would be responsible for paying significant punitive damages.

### D. *Excessive Verdict*

Finally, defendants request a new trial on the ground that the verdict against Ms. Rader was excessive and was the result of passion or prejudice. While the Court believes that the jury was neither inflamed with passion nor overwhelmed with prejudice, the Court finds the verdict as to damages to be so excessive as to shock the judicial conscience.

The Court will examine compensatory and punitive damage awards separately.

### 1. *Compensatory damages*

▮ Plaintiff directs the Court's attention to cases in which courts upheld large jury verdicts for compensatory damages. *See* cases cited in *Corriz v. Naranjo,* 667 F.2d 892, 898 (10th Cir. 1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 2233, 72 L.Ed.2d

844 (1982). Plaintiff should note, however, that *Corriz* and the cases cited therein addressed the issue of compensatory damages for violations of constitutional rights. As noted earlier in this opinion, the only substantive basis for recovery of compensatory damages was a violation of Title VII. Acknowledging, as plaintiff urges, that emotional distress and other intangible injuries are compensable, the Court nonetheless finds that the jury's verdict for $90,000 is unreasonable on its face. *Cf. Parker v. Shonfeld,* 409 F.Supp. 876 (N.D.Cal.1976) (jury verdict of $10,000 in compensatory damages and $10,000 in punitive damages for violation of federal fair housing laws not disturbed by trial court).

Compensatory damages are not intended to punish, but instead to make plaintiff whole for his injury. Plaintiff simply failed to demonstrate at trial that he suffered such emotional and mental damage, proximately caused by defendant Rader's conduct, to justify an award anywhere near $90,000.

The Court carefully instructed the jury that plaintiff's medical condition and surgery, with its attendant pain, suffering, humiliation or medical care could not be considered in determining compensatory damages. Instead, the only injury for which plaintiff may receive compensatory damages is any mental or emotional pain, suffering and distress proximately caused by Ms. Rader's actions.

Considering the evidence in the light most favorable to plaintiff, he showed the following items of mental or emotional damage:

### a. *Relationships with Co-workers*

Plaintiff testified that the termination adversely affected his dealings with peers and supervisors at work:

MR. HUEBSCHEN: I think I was in the hospital until mid-March sometime or early March, and then I came back to work almost immediately after that.

MR. FOX: Can you describe the atmosphere at work when you came back in early March?

MR. HUEBSCHEN: Well, it was—I felt really isolated and pretty much out of it. I was not even beginning to recover from the surgery. I couldn't stand up straight or anything but I could mainly just recall being in a fog and trying to come in and do my work and trying to stay together.

\* \* \* \* \* \*

MR. FOX: Apart from that surgery and the feelings about that surgery that you just expressed, can you describe your interaction or what kind of interaction you had with other employees?

MR. HUEBSCHEN: Almost no interaction. I sat in my cubicle and tried to do my cases and sometimes I would go talk to Vila a little bit about that I was having a hard time, but I really can't recall—maybe people coming by—

MR. FOX: How did that differ in terms of your social interaction with other employees? How did that differ from the way you were prior to this time?

MR. HUEBSCHEN: I used to be—I knew a lot of the people. I knew everyone in the office or just about anyway and, you know, say hello to people, you know, passed the time of day in the course of the work day. I think there was almost some—I don't know if people thought I was a double outcast or what between the demotion and the illness, and I think people felt bad and maybe they didn't know quite what to say to me either.

\* \* \* \* \* \*

MR. HUEBSCHEN: Number two, people were very uncomfortable. Some people didn't seem comfortable saying hello, or if I would walk into a room and there was a conversation, the conversation would stop as soon as I walked into the room. Not that it was about me or anything, but just because I would walk into the room. If I tried to talk to somebody, they would immediately look around and see who might see them talking to me, and I would sense a lot of discomfort from the other people as well as some on my own part and so I started to be more withdrawn.

\* \* \* \* \* \*

MR. HUEBSCHEN: At about this time is when LeRoy Stuczynski told me that he did not want to associate—did not want to be seen with me in the office. He was the first person that came out and actually said that.

MR. FOX: Are there any other instances that you can recall happening about that time?

MR. HUEBSCHEN: About specific statements by individuals, no.

\* \* \* \* \* \*

MR. HUEBSCHEN: When the Personnel Commission investigation began I—then I was totally, completely isolated. After that there was a great deal of fear I perceived.

MR. FOX: You are saying that but what types of things did you observe?

MR. HUEBSCHEN: At that point I observed that even close friends were just not comfortable around me and that they looked around whenever I was near them to see who might be observing us. That is all I can recall on specifics right now.

\* \* \* \* \* \*

MR. HUEBSCHEN: We had a very close relationship as friends and we had been peers. We were equals during the time I was a supervisor and in addition to our business relationship Vila would occasionally come to our home and we would occasionally go to her home and just discuss life in general as friends.

MR. FOX: How did that differ from the period you are talking about where you said there was a strain?

MR. HUEBSCHEN: The relationship became strictly business, no extraneous discussion.

\* \* \* \* \* \*

MR. FOX: How did that or did it affect you emotionally at all?

MR. HUEBSCHEN: It did. I felt very bad. I felt a sense of loss because she had been very close to me.

\* \* \* \* \* \*

MR. HUEBSCHEN: I had some interactions with my very closest friends.

MR. FOX: Who were they?

MR. HUEBSCHEN: Greg Nametz, Patty Hake, Tim Greenya.

MR. FOX: In terms of your relationship with those people, did you note any changes in your relationship with those people from before the termination to after the termination?

MR. HUEBSCHEN: Yes. There was a change.

MR. FOX: What was that change?

MR. HUEBSCHEN: Even those relationships seemed to be—I had trouble expressing myself and I was holding myself back from them and worrying that they might get in trouble for being my friends. That was a big worry that I had.

\* \* \* \* \* \*

MR. FOX: Again, describing the summer of '81, what if anything did your social life consist of at work?

MR. HUEBSCHEN: By this time I had none. I didn't go to any office parties or I didn't go to going-away parties for people. On one or two occasions I tried, but it just didn't work. People were not comfortable with me there. I wasn't comfortable. I almost felt out of fairness for the people I shouldn't be going so I stopped.

Tr. Huebschen testimony, July 19, pages 12, 13, 24, 29, 30, 37, 40, 41.

b. *Home Life*

Plaintiff also alluded to the change in his relationship with his wife:

MR. FOX: Again, this time focusing on your own home life, what was happening as far as your own home life was concerned?

MR. HUEBSCHEN: Our home life was—it had changed. I think the main focus was relief that the first surgery had come out all right and wishing that I didn't have to go into work every day because I was having a hard time going in emotionally and wishing the whole problem would just go away.

\* \* \* \* \* \*

MR. FOX: At that point in time what was your situation as far as your family was concerned?

MR. HUEBSCHEN: There is becoming more and more strain at home financially due to loss of income . . .

\* \* \* \* \* \*

MR. FOX: How did you perceive that situation at work in your home life? Did it have any effect on your home life at all?

MR. HUEBSCHEN: Yes. It had very much effect because it took so much out of me just to get out of bed and go in there and try to do my job and try to do it so well so I couldn't be criticized for bad job performance. It took so much out of me that when I came home I had nothing left.

MR. FOX: When was your baby born?

MR. HUEBSCHEN: October 12, 1981.

MR. FOX: What was your emotional state at that particular time?

MR. HUEBSCHEN: Again, it was—I felt real happy. We felt so lucky that she was healthy and it was a real nice time, and yet I felt like I had cheated Arimanda because I knew in my head that I was happy and yet it didn't come out good enough. I didn't live the happiness I felt, and I cheated her very badly because I just—I would only be happy temporarily, last a few hours, and then I would be right back where I was being withdrawn. I felt I made her miss something.

MR. FOX: What was it that you felt you made her miss?

MR. HUEBSCHEN: My full participation in being a father and just the terrific thrill. It was really terrific and I admired her even despite the way I was she didn't let that drag her down at all.

Tr. Huebschen testimony, July 19, pages 25, 30, 41, 42.

c. *Work Routine*

Plaintiff further testified that his work routine became regimented and unpleasant:

MR. HUEBSCHEN: What happened was I realized at this point that I was going to try to commit myself on going to the Personnel Commission and that I emo-

tionally could not afford—I needed to try to cancel out my feelings on things and just plod along day to day, and I became much more withdrawn and just tried to go into work every day and keep my nose clean, do a good job and go home and just try to gut it out pending a decision.

\* \* \* \* \* \*

MR. HUEBSCHEN: My work day was much more restricted, number one. I felt much higher pressure to make very sure that I was meeting every standard, every statistic that I felt vulnerable to. I didn't want to slip or have any slips in my job performance.

\* \* \* \* \* \*

MR. FOX: At that particular time can you describe again during that fall period your own emotional state that you were experiencing at work?

MR. HUEBSCHEN: I am getting mixed up again. We are in the fall of '81?

MR. FOX: Fall of '81.

MR. HUEBSCHEN: Oh, Vila was still my supervisor. My emotional state at work—by this time I had developed a check list of everything I had to do in order to do my job well, and I plodded every day from one point to the next. I kept stroke tallies of just minor little things that I had to do on the job, and they became my means of just getting through each day one at a time.

Tr. Huebschen testimony, July 19, pages 22, 24, 41.

d. *General Emotional State*

Finally, plaintiff described his emotional state during the months following his termination:

MR. FOX: Mr. Huebschen, I'm going to focus your attention if I can for the purposes of questioning in the damage phase of the trial to the period around December or mid-December after your probation was terminated. I would like to have you if you can describe to the jury your feelings immediately after the termination of that probation or let's say after that meeting with Jackie Rader that you already testified to where she informed you not to—or not to contest your termination of probation.

MR. HUEBSCHEN: Well, that is one of the factors, that meeting, and it came across so clearly of, you know, I'm going to make sure you lose all of your friends and make sure that everybody knows you are a chronic liar and knows you never bring up the true circumstances and, well, that added to I guess the degree of threat that I had already felt and what was going on at home at that time was just a mixture of many, many emotions of grief, of guilt and embarrassment I guess.

\* \* \* \* \* \*

MR. HUEBSCHEN: I felt really down. I felt that my earlier feelings of optimism that he would look into this had been dashed and, I don't know, I felt crushed when I came home.

\* \* \* \* \* \*

MR. FOX: During that period of time you described, and we are focusing on July, August of 1980, can you describe your own emotional state when you were going through that period of time?

MR. HUEBSCHEN: By this time, and this is the problem that I have been having, I can remember—I put myself on automatic pilot and everything just happened and I don't remember my emotions.

MR. REPASKY: It sounds very powerful but I don't know what it means.

MR. HUEBSCHEN: I don't remember my emotions. I tried my best not to have any.

\* \* \* \* \* \*

MR. FOX: Can you describe what you mean? What was your emotional state at that time?

MR. HUEBSCHEN: All right, my emotional state was that I tried not to feel fear or hurt if someone did not want to talk to me. I tried not to feel anger if I felt something had been unfair. I tried not to feel too optimistic if I thought anything good might be happening to me at the moment. I tried not to be affected by anything that was happening and just do everything step by step by step.

Tr. Huebschen testimony, July 19, pages 2, 11, 31, 32.

In its examination of the evidence, the Court did not attempt to separate the pain and suffering attributable to plaintiff's surgery and serious health problems, to his admittedly consensual affair with Ms. Rader, or to his dealings with other defendants or others. Instead, assuming all of the preceding paragraphs fairly describe the damage proximately caused by defendant Rader's actions, $90,000 in compensatory damages shocks the judicial conscience and will not be permitted to stand.

## 2. Punitive Damages

The jury also assessed $24,600 in punitive damages against defendant Rader. Defendants' motion for a new trial on damages because of the excessiveness of the verdict applies to this award as well. The Court applies the same standard in evaluating the excessiveness of punitive and compensatory damages. See Perfect Fit Industries, Inc. v. Acme Quilting Co., 494 F.Supp. 505, 509 (S.D.N.Y.1980). The Court finds that the punitive damage award against Ms. Rader is so excessive on its face that it shocks the judicial conscience.

In making this determination, the Court considers the twin aims of punitive damages: punishment of the wrongdoer and deterrence of similar illegal conduct in the future. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). The amount should be reasonably proportional to the evidence of purposeful conduct. Maxey v. Freightliner Corp., 450 F.Supp. 955 (N.D.Tex.1978) aff'd, 623 F.2d 395 (5th Cir. 1980). Punitive damages should be large enough to deter and punish, but not larger. Collins v. Brown, 268 F.Supp. 198 (D.C.D.C.1967).

In this case, the punitive damages awarded exceeded any amount required to punish defendant Rader or to deter future misconduct of this kind. Further, judged by the foregoing criteria, $24,600 is so ex-

cessive as to shock the judicial conscience and will not be permitted to stand.

## 3. Remittitur

The Court need not order a new trial, however. The Court may offer the plaintiff a remittitur, or reduction in the damages assessed by the jury. If plaintiff refuses the reduced award, the Court may grant a new trial. Ehret Company v. Eaton, Yale & Towne, Inc., 523 F.2d 280 (7th Cir. 1975), cert. denied, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 186 (1976); Durant v. Surety Homes Corp., 582 F.2d 1081, 1085 n.5 (7th Cir. 1978) (district court may alter verdict by order remittitur where jury returns a clearly excessive verdict without being inflamed by passion or bias). Remittitur is also available when the Court is faced with excessive punitive damages. See, for example, Lowe v. General Motors Corp., 624 F.2d 1373, 1383 (5th Cir. 1980). Cf. Morrissey v. National Maritime Union of America, 544 F.2d 19, 34 (2d Cir. 1976) ("trend toward extremely large punitive damage awards may require trial and even appellate courts to subject such awards to more exacting scrutiny than awards of compensatory damages"). But cf. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 270, 101 S.Ct. 2748, 2761, 69 L.Ed.2d 616 (1981) (broad discretion traditionally given to juries in assessing punitive damages).

The Court will therefore determine as a matter of law that $10,000 in compensatory damages and $15,000 in punitive damages is reasonable and shall order a new trial on damages unless plaintiff elects to accept judgment in the changed amount within ten days of the date of this order.

In this determination, the Court does not minimize the problem of sexual harassment in employment. Isolated excessive jury verdicts such as this one will not solve the problem, however. This Court has a solemn obligation to do justice between the parties. Permitting this verdict to stand would violate that sworn duty.[23]

23. As the Court has granted defendant Stumbras' motion for judgment notwithstanding the

verdict, the damages assessed against him must fall. The Court also concludes that the

## IV. MOTION FOR ADDITIONAL ATTORNEY'S FEES

Plaintiff has filed a motion for an additional award of attorney's fees pursuant to 42 U.S.C. § 2000e–5 and 42 U.S.C. § 1988. The motion is granted in part, and plaintiff is awarded an additional $2,045.00 in attorney's fees.

In his initial application for attorney's fees, plaintiff requested $44,028.44 in attorney's fees. On August 27, 1982, the Court awarded plaintiff $21,726.00. Plaintiff now seeks an additional $16,404.00.

██ The Court follows the standard set forth in *Waters v. Wisconsin Steel Works of International Harvester Co.,* 502 F.2d 1309 (7th Cir. 1974). *Waters* held that the district court, in determining an award of attorney's fees in a Title VII action, may not rely solely on "hours spent times billing rate." Such a figure, however, is "a convenient starting point from which adjustments can be made for various other elements." *Id.* at 1322.

### 1. Hourly Rate

██ Attorney Fox claims that he should be compensated for time spent on this case at $75.00 per hour for all of his labor on this case. Plaintiff has not shown, as some courts demand, a reasonable rate for his in-court, as opposed to out-of-court time, *see Miller v. Carson,* 563 F.2d 741, 756 (5th Cir.), *rehearing denied,* 566 F.2d 106 (1977), nor has the Court carefully scrutinized each hour claimed by Mr. Fox.

Plaintiff works in a small law office in Madison. He has been a practicing lawyer for about six years. Although he argued his cause with considerable zeal and with some success, the Court cannot condone payment of $75.00 per hour for Mr. Fox's services. The Court finds, on the basis of its experience in the community and in the profession, that $50.00 per hour is a fair and reasonable hourly rate for an attorney of the experience and qualifications of Mr.

Fox, in a case such as this one. *See* Affidavit of Charles D. Hoornstra.

██ Attorney Terence Hawkins, who attended certain days at trial and also helped with trial preparation, claims that he should receive $50.00 per hour for 104.7 hours of work. Mr. Hawkins was admitted to the bar only days before the trial. He spoke once during the seven-day proceedings. The Court finds that a reasonable rate for Mr. Hawkins in this community is $30.00 per hour.

██ Law student Bruce Bachhuber is a clerk for Mr. Fox. He attended certain days at trial and provided legal research. He claims $20.00 per hour for 97.5 hours of work.

The Court will not permit plaintiff to recover attorney's fees for Mr. Bachhuber's services. The Court is aware that other courts permit recovery for legal services provided by law students. *See Berman v. Schweiker,* 531 F.Supp. 1149 (N.D.Ill.1982). This Court believes, however, that if Congress intends to compensate plaintiffs for work done by law students, it certainly may do so. As Congress has only provided for "reasonable *attorney's* fees" under Title VII and § 1988, the Court will take Congress at its word. In its discretion, the Court declines to expand upon the statutes that the legislative branch so carefully drafted.

### 2. Other Considerations

██ According to *Waters,* the Court must now consider eight factors in determining whether the "hours spent times billing rate" yields a reasonable result. The factors are:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

reduced compensatory damage award against Ms. Rader fully compensates plaintiff for his injuries. Furthermore, the record lacks any evidence of aggravating conduct to justify an award of punitive damages against Mr. Stumbras.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

502 F.2d at 1322.

As to the first factor, Mr. Fox argues that he had a very difficult case to prove, that the legal questions were complex, and that the sources of proof were all within defendants' control. The Court notes that the factual issues in this case were novel, but not more difficult than those involved in the average trial. The sources of proof included documents to which plaintiff had access through discovery and witnesses, equally available to both sides by subpoena. Some amount of time and labor was required, but Mr. Fox has been compensated, by the hour, for this labor.

As to the second factor, Mr. Fox has not claimed that he has refused work because of the demands of this case.

The third item has been previously discussed.

The fourth factor is manifested in other parts of this opinion: Mr. Fox was successful in convincing the jury of his client's position. In the context of plaintiff's recovery after this decision, the attorney's fees awarded by this Court are reasonable.

Fifth, Mr. Fox has not shown any extraordinary time limitation imposed by plaintiff or the circumstances. Sixth, Mr. Fox's relationship with Mr. Huebschen does not justify additional attorney's fees.

As to the seventh factor, Mr. Fox was obviously successful before the jury. His performance at trial, however, does not justify an increased award. As a lawyer for only six years, his experience and reputa-

tion have not reached a level requiring additional compensation. Furthermore, while Mr. Fox had an excellent grasp of the facts of this case, his legal analysis was adequate, but not outstanding.

Finally, Mr. Fox makes much of the fact that his fee was partially contingent. The Court notes first that had plaintiff not prevailed at trial, Mr. Fox would have received $7,500.00. Even though recovery of the balance due was contingent upon success at trial, the Court believes that the moneys already awarded in attorney's fees amply reward Mr. Fox for his risk.

Therefore, after consideration of the *Waters* criteria, the Court elects not to make adjustments from "hours spent times billing rate" and awards the following attorney's fees:

| | | | |
|---|---|---|---|
| Mr. Fox | $50.00 x 412.6 hours | = | $20,630.00 |
| Mr. Hawkins | $30.00 x 104.7 hours | = | 3,141.00 |
| Total | | | $23,771.00 |
| Attorney's Fees already awarded | | | 21,726.00 |
| Additional Award | | | $ 2,045.00 |

## V. MOTION FOR COSTS

Plaintiff has filed a motion for an award of costs. He seeks $6,007.33 in out-of-pocket expenses, in addition to his monetary awards of back-pay, compensatory and punitive damages, and attorney's fees. After an examination of the expenses claimed by plaintiff, in light of the applicable law, the Court grants the motion in part, awarding plaintiff $1,246.62 in costs.

The Court adopts the logic expressed in *Vecchione v. Wohlgemuth,* 481 F.Supp. 776 (E.D.Penn.1979). In *Vecchione,* a successful plaintiff in a civil rights case sued under 42 U.S.C. § 1988 for an award of attorney's fees and costs. The *Vecchione* court first examined Rule 54(d), Federal Rules of Civil Procedure. That rule provides, in part:

Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs · · ·

The court then identified those items which the district court may tax as costs by referring to 28 U.S.C. § 1920, which states:

A judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;

(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

*See also Northcross v. Bd. of Educ. of Memphis City Schools,* 611 F.2d 624 (6th Cir. 1979), *cert. denied* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980) (civil rights plaintiff in same posture as prevailing party in any other case with regard to costs aside from attorney's fees).

The Court will discuss each group of expenses separately.

### 1. *Legal Services*

 Plaintiff has applied separately for an award of attorney's fees. Such fees are not compensable as costs. Therefore, the following legal fees will not be taxed as costs:

| | |
|---|---:|
| Linda Demopulos-Rodriguez, research on complaint | $ 105.00 |
| Marlene Freund, research on polygraph brief | 62.50 |
| Marlene Freund, research on partial summary judgment | 7.50 |
| Cullen and Weston, fees and expenses | 1,857.20 |
| Total | $2,032.20 |

### 2. *Deposition Costs*

 Plaintiff requested $875.85 for court reporting at five depositions. Under 28 U.S.C. § 1920(2), this is permitted. The following expenses, which appear unrelated to the reporting of those depositions, do not fall under any of the provisions of § 1920 and will not be taxed as costs:

| | |
|---|---:|
| Deposition of Jacquelyn Rader | $ 202.20 |
| Deposition of David Huebschen | 51.96 |
| Deposition of Vila Seefeldt | 98.27 |
| Depositions of Kathy Lane, Tom Christopher and Mike Martin | 163.65 |
| Depositions of Mary Erlitz, Pearl Feddema, Gail Broadso and LeRoy Styczinski | 158.10 |
| Total | $ 674.18 |

### 3. *Witness Fees*

The Court will assess defendants with four witness fees claimed by plaintiff (or a total of $128.00). 28 U.S.C. § 1920(3).

### 4. *Copying and Typing*

The Court will tax the following copying and typing costs, 28 U.S.C. §§ 1920(3), 1920(4):

| | |
|---|---:|
| September copying | $ 19.70 |
| State Treasurer, copy of transcript | 4.20 |
| Dean Clinic, medical records | 16.00 |
| Copying costs, exhibits | 15.50 |
| Certified copy of license plate transfer number | 4.47 |
| Professional typing of initial complaint | 44.70 |
| Brown's Bookstore, cassette reproduction of Personnel Commission tapes | 26.20 |
| Total | $ 130.77 |

### 5. *Service and Filing Fees*

The Court will tax defendants with the following costs, 28 U.S.C. § 1920(1):

| | |
|---|---:|
| Filing Fee, Summons and Complaint | $60.00 |
| Jan Blackmon, Service of Summons and Complaint | 49.00 |
| United States Marshal, Service of Summons and Complaint | 3.00 |
| Total | $ 112.00 |

### 6. *Psychological Testing*

 Plaintiff has shown no support in 42 U.S.C. § 1988 or in 28 U.S.C. § 1920 for including this item in the bill of costs. Therefore, $200.00 for psychological testing will not be taxed against defendants.

### 7. *Finance Charge on Loan*

 In his most creative vein, plaintiff suggests that defendants be assessed with a finance charge of $321.37 on a loan he took out to pay the initial retainer for his lawyer. This item will not be taxed as a cost of the litigation.

### 8. *Expert Testimony*

Plaintiff seeks $350.00 for expert testimony from a Ted Welch at an earlier hearing on the use of polygraph. Even had Mr. Welch appeared at trial, he would not have received any further compensation than that provided to ordinary witnesses. *See Frigiquip Corp. v. Parker-Hannifin Corp.*, 75 F.R.D. 605 (D.Okl.1976). As Mr. Welch did not appear at trial, nor was his testimony ruled admissible or relevant, this item will be excluded from the bill of costs.

### 9. *Airline Tickets*

Finally, plaintiff seeks airfare "and related expenses" for two witnesses. Plaintiff seeks a total of $1,182.96 for two witnesses. In this District, the general rule is that witnesses receive twenty cents per mile for travel expenses, or the actual cost of their travel, whichever is less. Plaintiff is instructed to submit a more complete affidavit on this item within ten days of the date of this order.

Therefore, defendants will be taxed a total of $1,246.62 in costs, plus an additional sum to be determined pursuant to an affidavit from plaintiff.

### ORDER

IT IS ORDERED that defendants' motion for judgment notwithstanding the verdict is GRANTED as to defendant Bernard Stumbras, and in all other respects DENIED.

IT IS FURTHER ORDERED that defendants' motion to alter or amend the judgment against the Department of Health and Social Services is DENIED.

IT IS FURTHER ORDERED that defendants' motion for a new trial is GRANTED in part, unless plaintiff agrees to accept $10,000 in compensatory damages and $15,000 in punitive damages. If plaintiff does not agree to accept judgment in the changed amount within ten days of the date of this order, the Court will schedule a new trial on the issue of damages. If plaintiff agrees to accept the reduced judgment, the motion will be DENIED. For all other purposes, the Court's decision on pre-trial motions shall be deemed rendered on August 27, 1982.

IT IS FURTHER ORDERED that plaintiff's motion for an additional award of attorney's fees is GRANTED in part. Plaintiff is awarded an additional $2,045 in attorney's fees.

IT IS FURTHER ORDERED that plaintiff's motion for an award of costs is GRANTED in part. Defendants shall be taxed $1,246.62, plus an additional sum to be determined after an examination of the affidavit requested in Part V of this decision.